Rexford G. Tugwell, Gobernador de Puerto Rico, sustituído por Jesús T. Piñero, querellante y apelante, *v.* Manuel A. Barreto, Alcalde de Mayagüez, querellado y apelado.

Núm. 19.—*Sometido:* Enero 13, 1948. *Resuelto:* Febrero 6, 1948.

146

*Hon. Procurador General Luis Negrón Fernández, José C. Aponte,*
*Fiscal General Especial,* y *Guillermo A. Gil, Procurador General*
*Auxiliar,* abogados del apelante; *Francisco M. Susoni, Jr., José*
*Rafael Gelpí* y *Mario Figueroa del Rosario,* abogados del ape-
lado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinón del tri-
bunal.

El 11 de octubre de 1945 el Gobernador presentó, ante la
Asamblea Municipal de Mayagüez, un pliego de cargos con-
tra el Alcalde. La Asamblea Municipal lo absolvió dos veces:
la primera, mediante aplicación indebida de la doctrina de
*res judicata;*[1] la segunda, declarando con lugar la excep-
ción previa interpuesta contra los primeros cuatro cargos
y absolviéndolo del quinto y último, luego de oír la prueba

---

[1] Esa resolución fué revocada en *Tugwell, Gobernador* v. *Barreto,* 65
D.P.R. 500.

que en relación con dicho cargo presentó el Gobernador y antes de que el Alcalde presentase la suya. La apelación que entonces interpuso el Gobernador fué desestimada en cuanto al quinto cargo, por haberse elevado una transcripción de evidencia certificada por el Presidente y no por la Asamblea Municipal en pleno; pero se revocó la decisión en lo que respecta a los primeros cuatro cargos. En consecuencia, fué devuelto el caso a la Asamblea, con instrucciones de proceder inmediatamente a recibir la evidencia de las partes, en relación con los referidos cuatro cargos y de resolver el caso en sus méritos.([2]) Viene ahora ante nos la decisión de la Asamblea Municipal absolviéndolo por los méritos de la prueba.([3])

El primer cargo imputa al Alcalde haber arrendado a Francisco P. Cintrón la plaza pública de Mayagüez y calles adyacentes y las de los barrios Balboa y Playa del mismo Municipio, sin la celebración de la subasta que exige la ley, para ser usadas en la instalación de artefactos de diversión durante las fiestas patronales que se celebraron desde el 22 de enero hasta el 2 de febrero de 1945.

El segundo le imputa haber permitido que el precio de dicho arrendamiento, $5,000.04, lo recibieran Matilde Nadal de Ramírez,([4]) y Miguel A. Yáñez, sin ingresarlo en el Tesoro Municipal.

El tercero lo acusa de haber permitido y autorizado que se gastara la referida suma en atenciones ajenas y extrañas a gastos legítimos del municipio de Mayagüez y sin la debida autorización de la Asamblea Municipal.

El cuarto hace una relación de algunos desembolsos que se alega hizo ilegalmente el Alcalde.

En su resolución la Asamblea Municipal declaró probado que el Comité de Festejos concedió un permiso a

([2]) *Tugwell, Gobernador* v. *Barreto,* 67 D.P.R. 546.
([3]) La decisión fué de ocho a cinco.
([4]) De la prueba resulta que el verdadero nombre de esta señora es Matilde Nadal de Vidal.

Francisco P. Cintrón para la instalación de picas, caballitos y otros artefactos de diversión en las inmediaciones de la Plaza Colón de aquella ciudad y en los barrios Balboa y Playa y calle Salud, por el precio de $5,000.04; que para acreditar el pago de esa cantidad fué otorgado un recibo firmado por la presidenta de las fiestas patronales, Sra. María Nadal de Vidal, por el tesorero del referido Comité, Sr. Miguel A. Yáñez y por el alcalde Manuel A. Barreto;(⁵) que para la concesión del permiso no se celebró subasta y que su precio fué convenido entre la Sra. Vidal y el Sr. Cintrón; que además del precio del permiso se obtuvo la suma de $876.50 por concepto de anuncios que se publicaron en el programa de las fiestas patronales; que tanto los $5,000.04 como los referidos $876.50, fueron ingresados en el "Fondo de las Fiestas Patronales de Mayagüez" en el banco Crédito y Ahorro Ponceño, sucursal de aquella ciudad; que para el pago de los gastos de las fiestas se giraba contra esa cuenta, mediante cheques firmados por el Tesorero del Comité de Festejos, Sr. Yáñez, quien a la vez era Colector de Rentas Internas de Mayagüez; que a iniciativa de la Sra. Vidal y sujeto a la condición de que al finalizar las fiestas patronales hubiese un sobrante no menor de $1,000 para el Asilo de Pobres, que era una institución municipal, se acordó hacer un donativo de $500 al Comité del Partido Popular Democrático para abonar a la deuda contraída con el Banco por concepto de gastos eleccionarios y que dicha suma fuese pagada con cargo al producto de los anuncios publicados en

---

(⁵)Dicho recibo dice así:

"Mayagüez, Puerto Rico,—Diciembre 12 de 1944.—He recibido de don Francisco P. Cintrón la cantidad de CINCO MIL DÓLARES ($5,000) por concepto de arrendamiento de la PLAZA DE COLÓN y sitios de la ciudad de Mayagüez radicados en Balboa y la Playa para la instalación de espectáculos públicos y juegos lícitos durante la celebración de las FIESTAS PATRONALES de 1945; quedando entendido que el Sr. Cintrón tendrá el derecho exclusivo a la explotación del negocio durante la duración de las fiestas.—POR LA COMISIÓN DE FESTEJOS DE LAS FIESTAS PATRONALES DE 1945.—Matilde Nadal de Vidal.—Presidenta.— (fdo.) Matilde Nadal de Vidal.—Miguel A. Yáñez, Tesorero.—(fdo.) Miguel A. Yáñez.—V.B.(fdo.) M A. Barreto—Manuel A. Barreto, Alcalde de Mayagüez."

el programa; que es costumbre en el Municipio de Maya-
güez y en todos los de la Isla, incluyendo al Gobierno de
la Capital, considerar las actividades de las fiestas patro-
nales como extrañas al funcionamiento del municipio y sus
fondos no se consideran ingresos del Gobierno Municipal;
que el querellado no realizó acto alguno que lesionara los
intereses del Municipio, ni se benefició personalmente por el
hecho de haber autorizado al Comité de Festejos para dis-
poner de dichos fondos como lo estimase conveniente, en re-
lación con dichas fiestas; que el Auditor de Puerto Rico no
había promulgado reglamento alguno con referencia a las
fiestas patronales, por lo que, a juicio de la Asamblea Mu-
nicipal, tácitamente había autorizado la práctica de consi-
derar estas fiestas como ajenas al funcionamiento del Go-
bierno Municipal, e invoca la Asamblea una comunicación
del Presidente del Senado, de 6 de diciembe de 1945;(⁶) que
la entrega de los donativos, premios, etc., incluídos en el
programa de las fiestas, fueron repartidos; que las actua-
ciones del Alcalde han sido siempre correctas e inspiradas
en el mejor deseo de beneficiar al Municipio; que la eviden-
cia admitida en apoyo de la querella sólo demuestra meras
irregularidades administrativas; y, por último, que la Asam-

---

(⁶)La carta del Sr. Luis Muñoz Marín, dirigida al Presidente de la Aso-
ciación de Alcaldes, en lo pertinente dice:

"... También hablé con el Auditor Cordero sobre el asunto de las fiestas
patronales y sobre la legalidad de proveer fondos para la Asociación de Alcal-
des. Le expliqué que evidentemente un número de Alcaldes no han procedido
dentro del estricto procedimiento legal al hacer arreglos para el uso de las
plazas para fiestas patronales. Nadie dice nada sobre esto hasta que algún
enemigo del Alcalde tiene interés en crearle dificultades; y entonces, por moti-
vación que rara vez es cívica, se crea un conflicto. Lo que le pedí al Auditor
sobre esto fué que hiciera las investigaciones en todos los casos que él creyera
que debía hacerla, pero que, en todos los casos de fiestas patronales celebradas
antes de su circular, busque la evidencia de si hubo o no mala fe en el pro-
cedimiento, y que si claramente no hubo mala fe se limite a llamarle la
atención al Alcalde concernido e instruirlo sobre el procedimiento que debe
seguir. El Auditor estuvo de acuerdo en hacerlo así. Desde luego, los Alcaldes
deben tener sumo cuidado en evitar toda violación técnica de la ley en el
futuro, tanto en este respecto como en otros. . ."

blea considera que la evidencia presentada en apoyo de los cargos no justifica la separación del Alcalde.

La mayoría de la Asamblea, como hemos visto, declaró probado que el contrato de arrendamiento o permiso para el uso de sitios públicos, se hizo sin la celebración de subasta; que esos fondos no fueron depositados en las arcas municipales y que contra ellos se giró por personas que ninguna ingerencia tenían con la administración municipal. Pero hay algo más grave que la mayoría de la Asamblea silencia al exponer sus conclusiones de hecho y que fué probado con la evidencia incontrovertida del Gobernador, a saber: que con cargo a los fondos de las fiestas patronales se tomaron $500 para abonarlos al Crédito y Ahorro Ponceño a cuenta de una obligación, de la cual eran responsables el Alcalde, Miguel A. Yáñez y otros, y la cual obligación se contrajo para hacer frente a los gastos del Partido Popular en la campaña electoral de 1944. Se hicieron dos cheques por $250. Uno de ellos a la orden de Miguel A. Yáñez, quien era el tesorero del Comité de Finanzas del Partido Popular. El otro a la orden de Manuel A. Barreto, quien era presidente de dicho Comité. Y resulta significativo que estos cheques, que pudieron haber sido endosados al Crédito y Ahorro Ponceño, fueron depositados en las respectivas cuentas particulares de sus tenedores, y después cada uno de ellos expidió un cheque personal por $250 a la orden del Comité de Finanzas del Partido Popular, el cual, a su vez, expidió el mismo día un cheque por la cantidad de $500, a la orden del Crédito y Ahorro Ponceño, para abonar a la obligación antes mencionada.[7] No obstante esta prueba, la mayoría de la Asamblea resolvió que se trataba de meras irregularidades,

---

[7] Este hecho está sostenido por las declaraciones del Gerente del Crédito y Ahorro Ponceño, por la de Miguel A. Yáñez y por los dos cheques números 47 y 48, por $250 cada uno, expedidos a la orden de Miguel A. Yáñez y Manuel A. Barreto, respectivamente, por el Tesorero del Comité de Festejos Sr. Yáñez. La explicación que para este rodeo da el Sr. Yáñez es que, tanto él como Barreto, creían "que no se veía bien hacer un cheque a nombre del Comité de un Partido".

las cuales ningún perjuicio habían causado al Municipio de Mayagüez, e insinúa que dichos $500 se tomaron de los $876.50 producidos por la publicación de los anuncios en el programa de las fiestas patronales.(8)

La mayoría de la Asamblea busca apoyo, en lo que respecta al requisito de la pública subasta, en lo que dice era la costumbre, tanto en Mayagüez como en otros municipios, incluyendo al Gobierno de la Capital, e invoca la carta del Presidente del Senado.(9)   Suponiendo que el desuso, la costumbre, o la práctica en contrario pudiera prevalecer contra la observancia de la ley,(10) lo cual negamos por prohibirlo expresamente el artículo 5 del Código Civil, tendríamos que resolver que en cuanto a la prueba de la costumbre, la conclusión de la Asamblea no está sostenida por la evidencia

---

(8)La prueba revela, sin embargo, que el costo del programa de las fiestas patronales ascendió a $453.40, como resulta de los siguientes cheques firmados por el Tesorero del Comité de Festejos Sr. Yáñez:

| | |
|---|---:|
| Cheque núm.  1 | $100.00 |
| Cheque núm. 15 | 300.00 |
| Cheque núm. 28 | 10.00 |
| Cheque núm. 34 | 5.00 |
| Cheque núm. 50 | 38.40 |
| Total | $453.40 |

Deducidos los 453.40 que costó el programa de los $876.50 que produjeron los anuncios, sólo quedan 423.10, lo cual demuestra que los $500 no se pagaron totalmente con el producto de los anuncios publicados en el programa.

(9)Véase la nota 6.

(10)Sobre el requisito indispensable de la pública subasta, el art. 8, inciso 5 de la Ley Municipal (Ley núm. 53 de 28 de abril de 1928, pág. 335), en lo pertinente prescribe:

"5. No se podrá . . . arrendar . . . *ni en modo alguno disponer*, de propiedad alguna municipal, sino mediante pública subasta, excepto en los casos en que expresamente se permita por esta Ley que se haga de otro modo. . ." (Bastardillas nuestras.)

Y en lo que respecta al deber de ingresar los fondos en el Tesoro Municipal, la sección 3(a) del Reglamento para el Régimen de la Contabilidad Municipal en vigor desde el 1ro. de julio de 1937, en lo pertinente, dispone:

"El Tesorero Municipal depositará todos los fondos pertenecientes al municipio o que estén bajo la custodia de éste, en un banco debidamente incorporado (o agencia o sucursal del mismo) que sea designado por la Junta Administrativa mediante resolución, debiéndose proteger todo depósito como dispone este reglamento. . ."

presentada. Evidentemente la existencia de la costumbre no está sostenida por la carta del Sr. Muñoz Marín, en la que tanto énfasis pone la Asamblea. Tomamos de dicha carta: '' También hablé con el Auditor Cordero sobre el asunto de las fiestas patronales . . . le expliqué que evidentemente *un número de alcaldes* no han procedido dentro del estricto procedimiento legal al hacer arreglos para el uso de las plazas para fiestas patronales.'' (Bastardillas nuestras.) No puede inferirse de esa manifestación que sea costumbre ''en todos los municipios de la isla . . . que las fiestas patronales de los municipios y sus fondos no fueran considerados como ingresos del gobierno municipal''. Lo que en realidad indica la carta es la excepción, un número de alcaldes—no sabemos cuántos ni cuándo—que han violado la ley. Pero esto no es todo. El Gobernador ofreció en evidencia y fueron admitidos sin oposición, los avisos de subasta de las plazas y sitios públicos de la ciudad de Mayagüez para las fiestas patronales de los años 1943 y 1944, publicados en ''La Democracia'', según la declaración jurada de su Administrador. El aviso de subasta con respecto a las fiestas patronales de 1944 dice así:

''MUNICIPIO DE MAYAGÜEZ.—Oficina del Alcalde.—*Aviso de Subasta*.—La Junta de Subasta del Municipio de Mayagüez recibirá proposiciones hasta el día 3 de enero de 1944, a las 2:45 P. M. para la subasta del arrendamiento de la Plaza de Colón y otros sitios de la ciudad para la instalación de espectáculos y juegos permitidos por la Ley durante la celebración de las Fiestas Patronales de Nuestra Señora de la Candelaria, que se llevarán a efecto durante los días comprendidos entre el 23 de enero de 1944 y el 2 de febrero del mismo año.

''Los pliegos de condiciones para la concurrencia a esta subasta deberán obtenerse en la Oficina del Secretario Municipal.—*Manuel A. Barreto*.—Alcalde.—Mayagüez, Puerto Rico.—Diciembre 18 de 1943.''([11])

---

([11]) El aviso de subasta para las fiestas de 1943, también firmado por el Alcalde querellado, es sustancialmente igual al anteriormente transcrito.

No vemos cómo pudo invocarse tal costumbre cuando por lo menos durante los dos años que inmediatamente precedieron al 1945, el Alcalde querellado, a través de la Junta de Subasta, cumplió con el requisito legal de la pública subasta para el arrendamiento de dichos sitios públicos. ¿Qué justificación tiene el Alcalde para no haber adoptado en 1945 el mismo procedimiento que había seguido en los años 1943 y 1944? De los autos no surge explicación alguna para variar el procedimiento prescrito por la ley.

■ El abogado del querellado, en su alegato lo mismo que en su informe oral, trata de restarle importancia a los cargos arguyendo que las plazas y calles de un municipio no pueden ser objeto de arrendamiento. De esa premisa concluye que el dinero producido por tal arrendamiento no constituye un fondo del municipio y que, por consiguiente, no tenía que ser ingresado en el Tesoro Municipal.

Que no hay imposibilidad legal para el arrendamiento de plazas y calles para establecer casetas y artefactos de diversión, resulta del inciso "f" (6) y (7), artículo 46 de la Ley Municipal, según fué enmendado dicho inciso por la Ley núm. 98 de 1931, págs. 595, 617.([12])

De cualquier modo, como dijimos en *Tugwell, Gobernador,* v. *Barreto,* 67 D.P.R. 546, 555:

"A los efectos de esta opinión, es innecesario resolver si los bienes de uso público pueden ser objeto del contrato de arrendamiento. En la hipótesis de que lo fueran, para arrendarlos tendría que cumplirse con el requisito previo de la subasta; y suponiendo que no pudieran ser objeto de arrendamiento, se alega que fueron arrendados. Bajo una u otra hipótesis, el Alcalde actuó en violación de la ley."

*Procede, por lo expuesto, revocar la decisión de la Asamblea Municipal de Mayagüez, dictada con fecha 7 de noviembre de 1947, y se ordena la destitución del Alcalde.*

([12]) El referido inciso reserva a los municipios la facultad de imponer cualquier arbitrio, licencia o contribución de [cualquier] otra clase que decretare la asamblea municipal correspondiente, sobre:

"6. Licencia para colocar sillas o casetas en sitios públicos.

"7. Licencia para diversiones o espectáculos públicos."