EDELMIRO RODRÍGUEZ RIVERA, peticionario, *v.* COMISIÓN PARA VENTILAR QUERELLAS MUNICIPALES y HON. LUIS MUÑOZ MARÍN, GOBERNADOR, recurridos.

*Número:* 2 *Resuelto:* 5 de diciembre de 1961.

*Benjamín Ortiz* y *Angel Viera Martínez,* abogados del peticionario, *Hon. Secretario de Justicia, Hiram R. Cancio, (José C. Aponte, Fiscal Especial General, Baldomero Freyre, Fiscal Especial General, Juan Lorenzo Rodríguez, Fiscal Especial* y *Gerardo Méndez Correa, Fiscal Especial* en el alegato), abogados de los recurridos.

Sala integrada por el Juez Presidente Sr. Negrón Fernández como Presidente de Sala, y los Jueces Asociados Señores Blanco Lugo y Rigau.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

En 17 de marzo de 1959 la Comisión Para Ventilar Querellas Municipales dictó resolución ordenando la destitución de Edelmiro Rodríguez Rivera del cargo de alcalde del municipio de Aibonito, al declarar con lugar el primero de cuatro cargos que mediante la querella correspondiente había presentado en su contra el Gobernador de Puerto Rico. Contra esta resolución recurrió el querellado mediante el recurso de certiorari provisto por el inciso 10 del artículo 29 de la Ley Municipal de 1928 (21 L.P.R.A. sec. 132), según fue enmendado por la Ley núm. 4 de 7 de diciembre de 1955 (Leyes, pág. 63).(¹)

---

(¹) El inciso mencionado lee como sigue:

"(10) En el caso de ser destituido, el alcalde tendrá derecho a recurrir ante el Tribunal Supremo de Puerto Rico dentro del término de diez (10) días después de notificada dicha resolución para que se determine si la misma estuvo o no justificada. Dicha determinación será en procedimiento de *certiorari* y las conclusiones de hecho de la comisión serán finales."

El artículo 29 mencionado fue incorporado íntegramente en la nueva Ley Municipal en vigor desde el 9 de enero de 1961: artículo 37 de la Ley núm. 142 de 21 de julio de 1960, pág. 526, 21 L.P.R.A. sec. 1256.

Los hechos imputados en el cargo declarado probado, y que a juicio de la Comisión "constituyen *actuación ilegal* por parte del querellado", fueron: 1) haberse apropiado y disponer mediante donación o venta, sin tener la autorización de organismo municipal alguno, de material de construcción sobrante utilizable, proveniente de la demolición de varias edificaciones de la barriada El Coquí de Aibonito, el cual había sido cedido por la Autoridad sobre Hogares de dicho municipio; 2) haber recaudado por concepto de venta de dichos materiales la cantidad aproximada de $1,677.50, que no ingresó en los fondos municipales, y de la cual no dio conocimiento ni al auditor ni al tesorero del municipio, y de la cual dispuso en la forma que creyó más conveniente; 3) no haber dado conocimiento a ningún funcionario u organismo municipal de las gestiones oficiales que realizó para que se cedieran al municipio los referidos materiales para la realización de obras de interés público. Se señala la comisión de siete errores.

1, 2 Los hechos constitutivos del cargo reseñado ocurrieron antes del día 7 de diciembre de 1955, fecha en que se aprobó y comenzó a regir la Ley núm. 4 que creó la Comisión para Ventilar Querellas Municipales, organismo al cual se encomendó la facultad de oir y resolver sobre los cargos que se formularen contra un alcalde "por razón de conducta inmoral o actuaciones ilegales en el desempeño de sus funciones". Sostiene el querellado que la Comisión actuó erróneamente al aplicar dicha ley retroactivamente, o sea en conocer como causa de destitución de hechos ocurridos antes de su vigencia.

■ No es necesario que entremos a considerar todos los planteamientos que hace el querellado al margen de este supuesto error. Tanto bajo la ley vigente al tiempo de la comisión de los actos constitutivos del cargo reseñado—artículo 29 de la Ley Municipal de 1928, según enmendado por la Ley núm. 55 de 18 de abril de 1950 (Leyes, pág. 139)—como bajo la misma disposición según enmendada posteriormente mediante la Ley núm. 4 de 17 de diciembre de 1955, las "actua-

ciones ilegales en el desempeño de [las] funciones" del puesto de alcalde constituyen causa suficiente para que se ordene la destitución. No es preciso pues que resolvamos si el cambio de conducta "gravemente inmoral" (Ley 55 de 1950, supra) a conducta simplemente "inmoral" (Ley 4 de 1955, supra) colocó al peticionario en una posición más gravosa. La resolución privándole del ejercicio del cargo no se fundó en esta causa. La comisión recurrida solamente tenía que determinar si la conducta del peticionario sometida para su examen e investigación constituía "actuaciones ilegales".

La queja de que el estatuto no proporciona una norma adecuada para determinar la conducta inmoral que da margen a la destitución tampoco requiere ser considerada por el fundamento antes expuesto de que en el presente caso la destitución del querellado obedeció a sus actuaciones ilegales. Aun a riesgo de incurrir en tautología, actuaciones ilegales es meramente conducta contraria a la ley. A este respecto en el cargo presentado por el Gobernador, después de describir los actos que se le imputaban, hízose referencia a las disposiciones específicas de ley que fueron alegadamente infringidas,(²) poniendo así al querellado en condiciones para preparar una adecuada defensa.

3, 4 Los errores tercero y cuarto se dirigen a impugnar la destitución, porque a) aún aceptando las conclusiones de hecho formuladas por la Comisión, éstas no son suficientes si, como se concluyó, el peticionario no obtuvo lucro ni beneficio personal como resultado de los hechos que se declararon probados; y, b) no se demostró que ninguna de las transacciones

---

(²) El primer cargo, después de describir los actos imputados al alcalde Rodríguez, termina:

"Al así actuar, Edelmiro Rodríguez Rivera violó las disposiciones de la Ley Municipal y del Reglamento Para la Contabilidad Municipal aplicables al caso, muy especialmente el Artículo 8, inciso 5 de la Ley Municipal, y las secciones 31(3), 40, 44(a) y 46(a) del mencionado Reglamento, privando ilegal, voluntaria y maliciosamente al Municipio de Aibonito de propiedad mueble, cual eran los materiales cedídosle al Municipio de Aibonito y de la cantidad de dinero antes mencionada, $2,836.00, los que utilizó para fines ajenos a su legítima administración."

efectuadas por el peticionario fuera por una suma mayor de $200, según se exige por el artículo 8 de la Ley Municipal de 1928, 21 L.P.R.A. sec. 34, y además, las secciones del Reglamento para la Contabilidad Municipal que se sugiere fueron infringidas no le imponían personalmente deberes a él sino a otros funcionarios municipales.

Para poder disponer adecuadamente de estos apuntamientos copiamos en el apéndice "A" de esta opinión las determinaciones de hecho de la Comisión. Al hacerlo, deseamos recalcar que por disposición expresa de ley, "las conclusiones de hecho de la comisión serán finales", y que no hay la más leve insinuación de que las formuladas no estén sostenidas por la evidencia.

La ausencia de beneficio personal para el funcionario destituido no conlleva necesariamente la exoneración del cargo formuládole. En situaciones similares así lo hemos expresado. En *In re Fonseca* v. *Gely*, 42 D.P.R. 195 (1931) sostuvimos la destitución del alcalde decretada por la asamblea municipal a virtud de cargos al efecto de que dicho funcionario había arrendado parte de la plaza del mercado en contravención de una ordenanza que requería la intervención de la asamblea para ello, y, además, que había dispuesto de sesenta dólares recibidos por él en concepto de cánones de arrendamiento, y no los ingresó en el tesoro municipal, sin que obstara para ello el hecho de que el querellado no se los había apropiado personalmente, pues de todas formas, "no puede excusar [se] el mal uso de dineros pertenecientes al municipio". La ausencia de intención de defraudar tampoco constituye una defensa válida cuando el acto imputado es claramente contrario a la ley, *Asamblea Municipal* v. *González, Alcalde*, 55 D.P.R. 542 (1939). Véanse, *Winship, Gobernador* v. *Asamblea Municipal de Manatí*, 55 D.P.R. 453 (1939); *Piñero, Gobernador* v. *Barreto*, 68 D.P.R. 145 (1948); *Piñero, Gobernador* v. *Grillasca, Alcalde*, 67 D.P.R. 908 (1947).

Aún cuando la prueba demostró que una gran parte de los materiales y de los fondos recibidos por la venta de los mis-

mos se destinó a la construcción de estaciones de leche en la zona rural del municipio y otras para la comunidad, "la realidad es que la solicitud sobre la cesión de dichos materiales fue hecha a la Autoridad sobre Hogares de Puerto Rico por el querellado, *en su carácter oficial* como alcalde de Aibonito, y que los materiales no fueron cedidos por la Autoridad al querellado en su carácter individual o particular; y sí en su carácter oficial como alcalde de Aibonito". (Bastardillas nuestras.) Siendo ello así se trataba de propiedad municipal para cuya disposición ha debido seguirse estrictamente el procedimiento que marca la ley y con el cual el querellado estaba indudablemente relacionado, pues regía los destinos municipales desde 1944. La conducta del Alcalde Rodríguez está reñida con las disposiciones del inciso 5 del artículo 8 de la Ley Municipal entonces vigente, (³) y constituye las "actuaciones ilegales" a que se refiere la ley como motivo de destitución. En la

---

(³) El artículo a que se ha hecho referencia lee como sigue:

"No se podrá vender, arrendar, hipotecar, gravar, ni en modo alguno disponer de propiedad alguna municipal, sino mediante pública subasta, excepto en los casos en que expresamente se permita por este subtítulo que se haga de otro modo, ni podrá permutarse dicha propiedad, sino por acuerdo de las dos terceras partes del número total de miembros de que se componga la asamblea municipal; *Disponiéndose, sin embargo*, que el requisito de la subasta pública no será aplicable cuando se trate de la venta de cualquier propiedad mueble del municipio cuyo valor real efectivo o valor residual sea inferior a $200; *Disponiéndose*, que dicho valor será determinado por el Secretario de Hacienda de Puerto Rico y deberá publicarse en el tablón de edictos de la alcaldía o municipio; *Disponiéndose*, que cuando cualquiera de estas negociaciones fuere hecha por un municipio con el Gobierno de los Estados Unidos de Norte América o con cualquiera de sus agencias, dependencias o instrumentalidades, o con el Estado Libre Asociado de Puerto Rico, o con cualquiera de sus agencias, dependencias o instrumentalidades, no habrá necesidad de subasta pública, pero dicha transacción deberá ser aprobada por el Gobernador de Puerto Rico, previa recomendación del Secretario de Justicia de Puerto Rico, en cuanto al aspecto legal de dicha transacción; *Disponiéndose, además*, que si se hubiere llevado a cabo alguna de estas transacciones o negociaciones entre algún municipio y El Pueblo de Puerto Rico, o entre algún municipio y el pueblo de Estados Unidos, quedará por este subtítulo convalidado ipso facto, no obstante lo anterior, nada impedirá que el municipio, mediante reglamentación al efecto, que prepare la Asamblea Municipal y apruebe el Secretario de Hacienda de Puerto Rico, pueda arrendar propiedad mueble del municipio por un canon razonable."

única forma que podríamos exonerarle es si resolviéramos que la Autoridad sobre Hogares cedió los materiales a Rodríguez en su carácter personal, de ser esto posible, pero nos estrellamos ante las conclusiones de hecho definitivas que sobre el particular formuló la Comisión, que están respaldadas por la evidencia ofrecida.

Tampoco tiene razón el peticionario al afirmar que la prueba no demostró que ninguna de las transacciones fuera por una suma mayor de $200, para así tratar de cobijarse bajo la excepción que contiene el artículo citado de que no será necesaria la subasta pública para disponer de propiedad municipal cuando el valor real y efectivo sea inferior a dicha suma. Específicamente la Comisión concluyó sobre la existencia de ventas a Juan Negrón Colón y a Juanita Rosado de Dávila por $225 y $200 respectivamente (véase, determinación de hechos núm. 11). En cuanto a las otras ventas tampoco se cumplió con el requisito de que el valor inferior a $200 será determinado por el Secretario de Hacienda y deberá publicarse en el tablón de edictos del ayuntamiento. Surge también que no se ofreció explicación alguna sobre la disposición de $179.50 del importe de las ventas efectuadas, pues mientras se estableció la realización de ventas por $1,677.50 (determinación de hechos núm. 15), sólo se justificaron regalos por $1,498 (determinación de hechos núm. 17).

 No asiste la razón al peticionario al indicar que las disposiciones del Reglamento para el Régimen de la Contabilidad Municipal aprobado en 14 de enero de 1949 que se resolvió habían sido infringidas no estaban en vigor para la fecha de los hechos. Baste decir que, si bien el artículo 20 de la Ley Orgánica de 1917—bajo cuyas disposiciones se redactó y promulgó por el Auditor dicho reglamento—fue dejado sin efecto al aprobarse la Ley de Relaciones Federales, la Ley núm. 10 de 24 de julio de 1952 (Leyes, pág. 23) que se aprobó para implantar los cambios introducidos al crearse el cargo de Contralor, transfirió al Departamento de Hacienda "todos los

deberes, funciones y facultades que por ley, *reglamento*, orden ejecutiva u ordenanza corresponden a la Oficina del Auditor o al Auditor al tiempo de aprobarse esta Ley, y que a virtud de la Sección 22 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico o de la Ley para crear y organizar la Oficina del Contralor de Puerto Rico, no hayan sido asignados a la Oficina del Contralor". (Bastardillas nuestras.) Como los hechos a que se refiere la querella presentada ocurrieron antes de 1957, no es necesario que resolvamos si la falta de radicación de dicho reglamento dentro del término de tres meses a partir del 30 de junio de 1957, según requerido por la sección 5 de la Ley núm. 112 de 30 de junio de 1957 (3 L.P.R.A. sec. 1045), conocida como Ley sobre Reglamentos de 1958, causa la nulidad del mismo.

■ Deseamos indicar que la conducta observada por el querellado no constituye meras violaciones técnicas a preceptos de ley, sino que evidencia un claro menosprecio a una de las disposiciones de mayor importancia en el régimen municipal —venta o enajenación de la propiedad de la comunidad. Esta reglamentación obedece sin duda al propósito de lograr una administración pública ordenada y a evitar que la disposición de la propiedad municipal pueda guiarse por criterios ajenos a la mejor práctica. Si condonáramos las actuaciones aquí envueltas estaríamos peligrosamente abriendo una puerta para que un funcionario en su deseo de perpetuarse en el cargo vendiera o arrendara los bienes públicos bajo las condiciones más ventajosas para su propia posición política, con posible detrimento de los mejores intereses de la comunidad en general.

Aun cuando en un marco de actividad limitado a los confines del municipio, el alcalde realiza en Puerto Rico una importante y delicada misión. Suya es la responsabilidad de dirigir y orientar la cosa pública dentro de normas de estricto orden y rectitud intachable. Afortunados hemos sido de que hayamos podido contar hasta el presente con hombres y mu-

jeres que han observado ejemplarmente estos cánones de conducta. Constituye un reconocimiento a esta magnífica labor el desarraigar prácticas que tiendan a subvertir las normas indicadas.

5 Los hechos que dieron margen a la destitución del querellado ocurrieron durante los años 1952 a 1955. En las elecciones generales celebradas en noviembre de 1956, Rodríguez fue reelecto para el cargo de alcalde del municipio de Aibonito. Sostiene que esta reelección subsanó y condonó las actuaciones anteriores caracterizadas como ilegales por la Comisión, y que, por tanto, es improcedente la destitución.

Desde 1938, este Tribunal en *Winship, Gobernador* v. *Asamblea Municipal*, 53 D.P.R. 138, 147, resolvió que un alcalde puede ser destituido dentro del término de una nueva administración para el cual es reelecto por hechos cometidos en su administración anterior. Después de exponer que no existía criterio unánime sobre esta cuestión, indicamos que "pesando ahora las razones aducidas en pro y en contra, nos parece más sana y efectiva la teoría que sostiene que el *impeachment* procede". Y así es en efecto. Dentro de las más sanas normas de administración de la cosa pública se requiere esta solución que garantiza la pureza en las actuaciones de los funcionarios y empleados. La administración pública demanda que consagremos a este respecto una norma que garantice ejecutorias dentro del marco de la más depurada corrección y moralidad.

Insiste el apelante que el *ratio decidendi* en la opinión de *Winship* fue la ausencia de una investigación con anterioridad a la reelección que pusiera en conocimiento del electorado las actuaciones objeto de censura. Hemos reexaminado detenidamente el texto aludido y nada encontramos para sostener tal posición. El Juez Presidente señor del Toro, después de adoptar en esta jurisdicción la regla que ya hemos expuesto, citó por vía de ilustración el lenguaje de la Corte Suprema de Iowa en *State* v. *Welsh*, 79 N. W. 369 (Iowa 1899) con el evidente propósito de indicar que el objeto principal de la

destitución "es librar a la comunidad de un funcionario corrupto, incapacitado e indigno de confianza". La referencia a que la conducta ofensiva puede que no haya sido descubierta con anterioridad a la elección no es el verdadero fundamento en que se apoya el tribunal citado. Por otro lado, el hecho de que el querellado hubiere sido objeto de una investigación no indica que los votantes tuvieran conocimiento pleno de las consecuencias de dicha investigación ni del alcance que se pretende darle al hecho de la reelección. En la misma vena, podemos añadir que la disposición del artículo 29(2) bajo la cual fue destituido el querellado—"por razón de . . . actuaciones ilegales en el desempeño de sus funciones"—es lo suficientemente amplia para justificar que se consideren actuaciones ocurridas durante un término anterior. *Stanley* v. *Jones*, 2 So.2d 45 (La. 1941); *Bolton* v. *Tulby*, 158 A. 805 (Conn. 1932); *Attorney General* v. *Pelletier*, 134 N. E. 407 (Mass. 1922); y especialmente, *Re Opinion of Justices*, 33 N. E.2d 275 (Mass. 1941), en donde se indicó que si se favoreciera la interpretación que propugna el apelante se frustraría en gran medida el propósito de lograr funcionarios idóneos y confiables, señalándose además que la identidad en el cargo y en las funciones desempeñadas demanda que, en defensa de los intereses de la comunidad, pueda ordenarse la destitución por actuaciones ocurridas antes de la reelección. Véase, además, *Removal of public officer for misconduct during previous term*, 138 A.L.R. 753 (1942); McQuillin, *The Law of Municipal Corporations*, 3a. ed. (1949) vol. 4, § 12, 238.

■ 6 Alega el querellado que la ley bajo la cual se le destituyó es inconstitucional ya que el mismo organismo que resuelve sobre la procedencia de los cargos determina previamente sobre la suficiencia de éstos. Para disponer de esta alegación basta referirnos a nuestra opinión en *In re Marín Báez*, 81 D.P.R. 274 (1959). En relación con el procedimiento para la destitución de jueces—este Tribunal ordenaba la investigación, la formulación de la correspondiente que-

rella y luego resuelve el caso en su fondo—, indicamos que nuestra participación en la etapa inicial de los hechos no transgrede el debido procedimiento de ley. Considerados los factores a que allí se hace referencia—la índole del procedimiento, el grado de relación o contacto del organismo que adjudica y los efectos de esta intervención previa en cuanto a su imparcialidad y desinterés—resulta evidentemente que la función de la Comisión para Ventilar Querellas Municipales al pasar sobre la suficiencia de los cargos formulados por el Gobernador de Puerto Rico no la incapacita para formar posteriormente un juicio imparcial y justo sobre los mismos, una vez considerada la evidencia aducida.([4]) Como cuestión de realidad, esta función es similar a la de cualquier tribunal que considera una moción para desestimar por insuficiencia de las alegaciones. A nadie se le ocurriría sostener que el juez que resuelve sobre la suficiencia de una demanda está impedido luego de ver y resolver el pleito en su fondo. Véanse, *Pueblo* v. *Quiles*, 82 D.P.R. 63 (1961) y *Pueblo* v. *Pacheco*, 83 D.P.R. 285 (1961).

Específicamente, en *Mangual, Alcalde* v. *Poventud, Juez*, 69 D.P.R. 824 (1942), que trataba de un procedimiento de destitución iniciado por un alcalde contra el secretario-auditor, resolvimos que el hecho de que el ejecutivo municipal formule los cargos y tenga conocimiento previo de los hechos en controversia, no lo imposibilita para actuar en la vista de los mismos, en ausencia de una demostración de pasión y prejuicio. Y en *Asamblea Municipal* v. *González, Alcalde*, 55 D.P.R. 542 (1939) sostuvimos que el mero hecho de que unos asambleístas municipales formularan cargos contra el alcalde no es motivo para su inhibición como jueces en el asunto, a menos que se demuestre alguna causa que les incapacite para actuar. Cf. *Rivera* v. *Junta de Relaciones del Trabajo*, 70

([4]) Es conveniente apuntar que de los cuatro cargos formulados, cuya suficiencia fue sostenida inicialmente, la Comisión desestimó tres, después de recibir la prueba de las partes.

D.P.R. 5 (1949). En general, véase, McQuillin, *op. cit.*, vol. 4, §12.259.

 7 Finalmente, sostiene el querellado que, de conformidad con la sección 21 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico,(⁵) la facultad para destituir alcaldes reside exclusivamente en la Asamblea Legislativa, y que la misma no puede ser válidamente delegada a ningún otro organismo, aun de su propia creación. Las escasas referencias en el historial de esta disposición constitucional que aparecen en el Diario de Sesiones de la Convención Constituyente lejos de confirmar esta interpretación, la desvirtúan. Al inquirirse por el delegado señor Veray sobre el carácter mandatorio del juicio de residencia por la comisión de delitos graves y su posible aplicación a los legisladores, el delegado señor Gutiérrez Franqui aclaró que este lenguaje no se refería a los legisladores, sino que "éstas son causas de residencia de *funcionarios ejecutivos*" (pág. 727). (Bastardillas nuestras.) Además, si la intención hubiese sido incluir a los alcaldes entre los funcionarios cuya destitución se reservaba exclusivamente a la Asamblea Legislativa, obviamente se hubiese hecho una referencia expresa al efecto en los in-

---

(⁵) Dicha sección lee como sigue:

"La Cámara de Representantes tendrá el poder exclusivo de iniciar procesos de residencia y con la concurrencia de dos terceras partes del número total de sus miembros formular acusación. El Senado tendrá el poder exclusivo de juzgar y dictar sentencia en todo proceso de residencia; y al reunirse para tal fin los Senadores actuarán a nombre del pueblo y lo harán bajo juramento o afirmación. No se pronunciará fallo condenatorio en un juicio de residencia sin la concurrencia de tres cuartas partes del número total de los miembros que componen el Senado, y la sentencia se limitará a la separación del cargo. La persona residenciada quedará expuesta y sujeta a acusación, juicio, sentencia y castigo conforme a la ley. Serán causas de residencia la traición, el soborno, otros delitos graves, y aquellos delitos menos graves que impliquen depravación. El Juez Presidente del Tribunal Supremo presidirá todo juicio de residencia del Gobernador.

"Las Cámaras legislativas podrán ventilar procesos de residencia en sus sesiones ordinarias o extraordinarias. Los presidentes de las cámaras a solicitud por escrito de dos terceras partes del número total de los miembros que componen la Cámara de Representantes, deberán convocarlas para entender en tales procesos."

formes de la comisión correspondiente o en las discusiones de la convención, especialmente considerando que la práctica tradicional hasta ese momento había sido encomendar tal función al Gobernador o a las asambleas municipales.(⁶)

Disposiciones similares a la sección 21 del Artículo III de nuestra Constitución han sido interpretadas que se refieren a funcionarios de determinada jerarquía, *State* v. *Sullivan*, 188 P.2d 592 (Ariz. 1948) ; *Lowrey* v. *Mayor, etc. of City of Central Falls*, 50 A. 639 (R. I. 1901), y en el caso de aquellos que han sido electos, a los que han recibido el voto general (*at large*). En otras palabras, no se ha aplicado a funcionarios electos por el voto limitado de los electores de un municipio. *Atlorney General* v. *Pelletier*, 134 N. E. 407 (Mass. 1922) ; *Attorney General* v. *Tufts*, 131 N. E. 573 (Mass. 1921) ; *In re Opinion of the Justices*, 46 N. E. 118 (1897).

■ La ley que creó la Comisión para Ventilar Querellas Municipales constituye un ejercicio por la Legislatura de la facultad concedídale en virtud de la sección 1 del Artículo VI de la Constitución "para crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo *a su régimen y función*".

*No habiéndose cometido los errores apuntados, y resultando que la destitución del querellado ordenada por la Comi-*

---

(⁶) En la discusión de la propuesta que luego se convirtió en la sección 1 del Artículo VI de la Constitución, el delegado señor Polanco Abreu observó que el propósito de la comisión era que se continuara bajo el mismo sistema municipal que hasta entonces prevalecía, "que se siga el mismo régimen municipal que actualmente rige". Diario de Sesiones de la Convención Constituyente, pág. 761.

Un examen de las distintas leyes aprobadas para el régimen municipal demuestra que hasta 1955, fecha en que se creó la Comisión para Ventilar Querellas Municipales, la facultad para residenciar el alcalde se concedió al Gobernador (Ley de 1 de marzo de 1902, pág. 238; sec. 35 de la Ley de 8 de marzo de 1906, pág. 112; art. 29 Ley núm. 11 de 25 de junio de 1924, pág. 89; art. 29 de la Ley núm. 92 de 22 de agosto de 1925, pág. 703) o a la asamblea municipal (art. 26 de la Ley núm. 85 de 31 de julio de 1919, pág. 699; art. 26 de la Ley núm. 60 de 12 de julio de 1921, pág. 445; art. 29 de la Ley núm. 92 de 22 de agosto de 1925, pág. 703—si el Gobernador no actuaba dentro de 20 días—, art. 29 de la Ley núm. 53 de 28 de abril de 1928, pág. 357).

*sión Para Ventilar Querellas Municipales estuvo justificada, se anulará el auto expedido.*

---

### APENDICE "A"

CONCLUSIONES DE HECHO DE LA COMISIÓN PARA VENTILAR
QUERELLAS MUNICIPALES EN EL CASO NÚM. 1: LUIS MUÑOZ
MARÍN, GOBERNADOR DE PUERTO RICO, QUERELLANTE, *vs.*
EDELMIRO RODRÍGUEZ RIVERA, ALCALDE DE AIBONITO,
QUERELLADO

"La Comisión ha hecho un análisis detenido y minucioso de toda la evidencia testifical y documental presentada por las partes en este caso, como resultado del cual y del estudio cuidadoso de la misma, llega a la conclusión de que se han probado los siguientes hechos:

"1—Edelmiro Rodríguez Rivera fue electo alcalde de Aibonito por primera vez en las elecciones generales celebradas el 7 de noviembre de 1944 y fue reelecto consecutivamente en las elecciones del 2 de noviembre de 1948, 4 de noviembre de 1952 y *6 de noviembre de 1956.*

"2—Hacia fines del año 1952, el querellado, *actuando en su condición de alcalde de Aibonito,* realizó gestiones personales ante la Autoridad Sobre Hogares de Puerto Rico para que ésta le cediese, *para fines de utilidad pública,* los materiales utilizables que sobrasen de la demolición que dicha agencia proyectaba llevar a cabo de la barriada El Coquí de Aibonito, como parte de su programa para la eliminación de arrabales.

"3—Como parte de las referidas gestiones el querellado celebró diversas entrevistas con el Sr. Emilio Serra, quien ocupaba el cargo de Director Ejecutivo de la Autoridad Sobre Hogares de Puerto Rico, y en el curso de tales entrevistas el Sr. Serra informó al querellado que podría accederse a la solicitud para la cesión de los materiales que sobrasen de la demolición de la barriada El Coquí siempre que dichos materiales fuesen *utilizados en obras de interés público.*

"4—El día 6 de diciembre de 1952 el querellado, *en su condición de alcalde de Aibonito,* y en armonía con las entrevistas que había celebrado con el Sr. Serra, dirigió a éste una carta solicitando formalmente 'la madera que pueda utilizarse del caserío de El Coquí' que la Autoridad Sobre Hogares se proponía

destruir como arrabal en el pueblo de Aibonito, y comunicando a la Autoridad que era el propósito del solicitante 'construir algunas estaciones de leche en los barrios de esta municipalidad y un centro comunal en el Proyecto Torres de la Autoridad de Tierras de Puerto Rico en este pueblo', por lo que 'sería de gran ayuda esta madera que ustedes van a tener de las casas a destruirse'. (Exhibit Núm. 3 del querellante.) La referida comunicación del querellado fue contestada por el Sr. Emilio Serra, Director Ejecutivo Auxiliar de la Autoridad Sobre Hogares, mediante carta de fecha 20 de enero de 1953, dirigida al querellado, *como alcalde de Aibonito*, en la cual informó a éste que la Autoridad estaría dispuesta a recomendar a la Housing and Home Finance Agency la aprobación de la anterior solicitud, *siempre y cuando el Gobierno Municipal de Aibonito conviniese en lo siguiente:*

'1—use the salvage materials for a purpose of public interest such as proposed in your letter;

'2—dispose of the left overs, or unused materials, by fire, or by other methods; in other words, that no profit is to be obtained from the materials except *for direct public use;*

'3—*the municipality, of its own account and under its own responsibility,* shall pick from the site and transport for its use, or to be destroyed, the materials in question.

'4—the *municipality* shall save the Authority from any claims, or damages, in connection with the handling and use of these materials from the site and transported to the place where they are to be used, or disposed of.' (Exhibit Núm. 4 del querellante)

"5—Terminó la comunicación del Sr. Serra al querellado advirtiendo a éste que si las condiciones reseñadas en la misma resultaban aceptables para él, sometiese una solicitud formal a la mayor brevedad posible.

"6—Con fecha 26 de enero de 1953 el querellado *en su condición de alcalde de Aibonito,* suscribió y entregó al Sr. Emilio Serra la carta que éste había redactado a solicitud del propio querellado, en contestación a la anterior. En dicha comunicación el querellado hizo solicitud formal para que se le cediesen

los materiales utilizables que sobrasen de la demolición de la barriada El Coquí y se comprometió a lo siguiente:

'If these salvage materials *are given to the municipal government the municipal government pledges* in lieu of the value of the said materials to pick up them from the demolition site; transport them away from the site for using whatever part of them is usable in the completion of a community center for public use which the municipality proposes to build; for erecting temporary free distribution centers of milk to children of the poor; and to dispose of the left overs by fire, or by other methods.' (Exhibit Núm. 5 de la parte querellante)

"7—El 10 de febrero del mismo año el Sr. Emilio Serra se dirigió por carta al querellado, *en su condición de alcalde de Aibonito,* acusando recibo de su comunicación del 26 de enero anterior, e informándole que la Autoridad 'no tiene objeción alguna en que *el municipio de Aibonito haga uso de todo el valor de recuperación*' de las estructuras a ser demolidas en el área del proyecto conocido como El Coquí 'siempre y cuando las siguientes condiciones sean observadas y cumplidas:

'a) Todo material inservible deberá ser destruido preferiblemente quemado;

'b) Después de recolectado todo el material servible e inservible del área, ésta deberá quedar completamente limpia de desperdicios;

'c) La Autoridad no se hace responsable de ningún accidente que le pueda ocurrir a persona alguna que trabaje en la recolección y transportación de dichos materiales. (Exhibit Núm. 6 del querellante)

"8—El 13 de enero de 1953 la Autoridad Sobre Hogares inició la demolición de las casas de la barriada El Coquí, que constituían un área de arrabal que la Autoridad se proponía eliminar como parte de su programa de renovación urbana.

"Durante las primeras semanas del proceso de demolición, la Autoridad Sobre Hogares se encargó de transportar los escombros y acopiarlos en un lugar destinado para ese fin dentro del área del proyecto. Posteriormente, en el mes de marzo o abril de 1953 la Autoridad abandonó toda la labor de limpieza de escombros y acarreo de los mismos y *el municipio de Aibonito* se hizo cargo de la disposición de los materiales utilizables resul-

tantes de la demolición de las casas y de la limpieza del área demolida.

"9—El proceso de demolición se extendió durante varios meses y fueron demolidas en total 127 estructuras en la barriada El Coquí. Los materiales utilizables que resultaron de tales demoliciones *pasaron a ser propiedad del municipio de Aibonito, según lo convenido por el alcalde querellado con los directores de la Autoridad Sobre Hogares.*

"10—No se practicó inventario alguno de los materiales utilizables que sobraron de la demolición de las casas de la barriada El Coquí, ni se hizo asiento alguno en los récords de contabilidad del municipio en cuanto a dichos materiales o el valor de los mismos.

"11—El alcalde, Edelmiro Rodríguez Rivera vendió materiales sobrantes de las casas demolidas en la barriada El Coquí a las personas cuyos nombres se reseñan a continuación, con indicación de los materiales que les fueron vendidos y el precio pagado por cada una de ellas:

1. Tomás Gutiérrez—madera usada—pagó con un cheque (Exh. Núm. 8, parte querellante) .......................... $60.00
2. Ramón Antonio Santiago—Pedacería de zinc ............................... 27.00
3. Rafael Rivera—pedacería de zinc........ 27.00
4. Luis Alvarado—paneles de madera, quedó a deber $5.00....................... 70.00
5. Juan Negrón Colón—madera usada y zinc corrugado ......................... 225.00
6. Juan Bautista Rivera Rodríguez—zinc usado ............................. 23.00
7. Juanita Rosado de Dávila—materiales usados ............................. 200.00
8. María González Rivera, alias Lalín—materiales usados ...................... 90.00
9. Francisco Berríos Cabrera—tubería usada 31.00
10. Eladio Rivera Rodríguez—zinc usado.... 90.00
11. Ramón Antonio Colón—materiales usados 75.00
12. Francisco Benítez León—pedazos de zinc y un inodoro ......................... 36.00
13. Julio Matos—materiales usados.......... 40.00

14. Sergio Martínez Colón—materiales usados 125. 00
15. José Morales Hernández—materiales usa-
 dos ............................... 160. 00
16. Alberto Muñoz Rosado—materiales usados 150. 00
17. Genaro Berríos Colón—tubos de agua.... 20. 00
18. Pedro Cartagena González, alias La Jarea
 —planchas de zinc................. 11. 00
19. Rafael Rivera Rivera—zinc liso usado.... 17. 50
20. Juan Irizarry Irizarry—planchas de zinc.. 20. 00
21. Máximo Martínez Mendoza—materiales
 usados ............................ 175. 00

 $1, 677. 50

"12—La mayor parte de las ventas de materiales reseñadas en el párrafo anterior fueron hechas por el querellado directamente, y él mismo recibió en dinero efectivo las cantidades en pago de las mismas. Algunas de dichas ventas las hizo el querellado por conducto de Nicasio Fernández, capataz de limpieza del municipio de Aibonito, pero en las ventas en que intervino éste, el producto de las mismas fue entregado también al querellado.

"13—El alcalde querellado regaló materiales utilizables que sobraron de las casas demolidas de la barriada El Coquí a las personas cuyos nombres se relacionan a continuación, a muchas de las cuales hizo también regalos en dinero efectivo junto con los materiales:

1. Dr. Francisco José Benliza Moya—médico
 de Beneficencia Municipal de Aibonito—
 15 ó 20 planchas de zinc y pedazos de
 madera 12 ó 15 virotes de madera para
 hacer un garage en su casa,
2. Nicasio Fernández—un poco de madera
3. Gil López Ortiz—madera vieja y $50. 00
4. Eduvigis Rivera Robles—madera de 4 ca-
 sas y 75. 00
5. Julia Colón Berríos—casita demolida y 50. 00
6. José Díaz Nieves—casa demolida y 25. 00
7. Tomás Rosario Franco—madera usada y 75. 00
8. Luis Rivera Rivera—para completar precio
 de compra de una casa 60. 00

9. Eduardo Mercado Ortiz—madera para construirle casas en el barrio La Plata a Saturna Vda. de Concepción, Fernando Rolón, Virgilio Cortés, Ramona Díaz y Catalina Díaz, y para clavos y materiales para dichas casas ... 60.00

10. Ramona Cortés Rivera—3 casas demolidas y ... 25.00

11. Julia Meléndez—cocinera Hospital Mpal. de Aibonito—casa demolida y ... 60.00

12. Felícita Cruz—empleada Hospital—dos casas demolidas y ... 100.00

13. Pedro Ortiz—esposo de una empleada del comedor escolar de Aibonito—dos casas demolidas y ... 50.00

14. Luis Martínez González—conserje de la Escuela Superior—dos casas demolidas y ... 50.00

15. Máximo González—dos casas demolidas y ... 37.00

16. Juan Molina Miranda—dos casas y ... 50.00

17. Ramona Santiago de Valladares—dos casitas demolidas y ... 60.00

18. Aguedo Colón Rodríguez—material usado y ... 60.00

19. Ramón Colón Rodríguez—dos casas demolidas y ... 65.00

20. Liberato Torres Rolón—madera usada y ... 50.00

---

$1,002.00

"14—Además de los regalos a las personas mencionadas en la relación anterior, el alcalde querellado regaló materiales utilizables sobrantes de la demolición de la barriada El Coquí a las siguientes personas:

a) Eduardo Charriez, Presidente del Comité de Gobierno de los parceleros de la barriada San Luis, le dio materiales sobrantes de El Coquí y $196.00 en dinero efectivo para la construcción de una estación de leche en el barrio San Luis en la parcela de Bartolo Ríos.

b) Ricardo R. Vázquez—Superintendente de Escuelas, madera sobrante de El Coquí para reparar la estación de leche del barrio Cuyón, para la construc-

ción de estaciones de leche en los barrios La Plata, Robles y San Luis, para la construcción de un anexo para salón de clases en el barrio Caonillas, y para la construcción de un local para la cooperativa "El Progreso de la Infancia", en el barrio Llanos Carretera.

c) Manuel Colón—materiales sobrantes para estaciones de leche en los barrios Hoyo Frío, Cuyón, Albarrobos, San Luis, El Pasto y Robles, además alrededor de $300.00 en dinero efectivo para repartir entre los trabajadores que participaron en dichas obras.

"15—El querellado recibió en dinero efectivo los pagos ascendentes en total a la cantidad de $1,677.50 por los materiales utilizables sobrantes de la demolición de casas de la barriada El Coquí que vendió a las personas nombradas en el párrafo 11, y no ingresó parte alguna de dicho dinero en los fondos del municipio de Aibonito, ni informó al Secretario Auditor ni al Tesorero Auditor Escolar, ni a la Asamblea Municipal, ni a ningún otro funcionario de dicho municipio, sobre el recibo de tales cantidades, ni se hizo asiento o entrada alguna en los libros de contabilidad del municipio de Aibonito sobre parte alguna del dinero que el querellado personalmente recibió por la venta de tales materiales.

"16—El querellado en ningún momento informó al Secretario Auditor, ni al Tesorero Director Escolar del municipio, ni a la Asamblea Municipal, ni a funcionario alguno de dicho municipio sobre los materiales utilizables de la barriada El Coquí que fueron cedidos al municipio de Aibonito, ni sobre el uso o disposición de los fondos que recibió por la venta de parte de dichos materiales.

"17—Los regalos en dinero efectivo, ascendentes en total a la suma de $1,498.00, que se han reseñado en los párrafos 13 y 14, fueron hechos por el querellado directa y personalmente, sin que parte alguna de los fondos que se utilizaron para dichos regalos se hubiesen contabilizado en los libros del municipio de Aibonito, y sin haberse contabilizado ninguno de tales regalos.

"18—Los regalos de materiales utilizables, sobrantes de la demolición de casas de la barriada El Coquí, que se han reseñado en el apartado 13, fueron hechos también por el querellado directa y personalmente, sin la intervención de ningún otro fun-

cionario del municipio de Aibonito, y sin que hubiese contabilizado ninguno de tales regalos.

"19—El querellado en ningún momento sometió informe alguno al Secretario Auditor o al Tesorero Director Escolar del municipio de Aibonito, a la Asamblea Municipal, o a funcionario alguno de dicho municipio, sobre los regalos en dinero efectivo o en materiales de construcción que se han reseñado en los párrafos 13 y 14." (Bastardillas nuestras.)