WALTER VÉLEZ RAMÍREZ y OTROS, demandantes y apelantes, *v.* HON. CARLOS ROMERO BARCELÓ y OTROS, demandados y apelados.

*Números:* R-79-285, O-79-438 *Resueltos:* 12 de mayo de 1982

718

*Héctor A. Colón Cruz, Procurador General, Miguel Pagán, Víctor Cruz Ojeda* y *Eunice Sein Llompart* del Departamento de Justicia, abogados de los demandados apelados; *Pedro Ortiz Álvarez, José L. Lebrón Velázquez, Carlos J. Córdova* y *Sergio Peña Clos*, abogados de los demandantes apelantes.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 9 de enero de 1975 Walter Vélez Ramírez, entonces Director de Obras Públicas del Municipio de Lajas,

reclamó ante el Fondo del Seguro del Estado por un accidente sufrido mientras ejercía funciones de su cargo. Alegó que el 6 de enero, al bajar de un *jeep* en un lugar donde se realizaban unas obras de instalación de tuberías en el sector Playa Rosada, resbaló y se lesionó una pierna. El Fondo dio curso a la reclamación y Vélez Ramírez comenzó a recibir tratamiento y los beneficios económicos dispuestos en la Ley.

En noviembre de 1975 Vélez fue nombrado Alcalde de Lajas en sustitución del incumbente que renunció. En las elecciones de 1976 postuló su candidatura por el Partido Popular Democrático. Durante la campaña fue tema y objeto de señalamiento y debate por sus adversarios que la lesión no había ocurrido en el ejercicio de sus funciones oficiales, sino mientras jugaba béisbol el 6 de enero en el parque José Basora de Lajas. Vélez fue electo alcalde. El 7 de noviembre de 1977, ya siendo alcalde recibió su último cheque del Fondo por la cantidad de $720. En total recibió beneficios en exceso de $1,900.

Posteriormente, el 28 de julio de 1977 el representante José Granados Navedo denunció lo ocurrido mediante carta al Fondo. Acompañó declaraciones juradas de testigos que vieron a Vélez sufrir un accidente durante el mencionado partido de pelota. La agencia inició una investigación.

El 20 de abril de 1978 Vélez prestó declaración jurada ante un auditor del Fondo. *Negó haber jugado béisbol el día 6 de enero.* En el informe a su superior, el funcionario investigador resumió el contenido de las declaraciones ofrecidas por varios testigos entrevistados y concluyó que había evidencia conflictiva en cuándo o cómo en verdad ocurrió el accidente. Sugirió finalmente que se empleara la investigación y se tomaran las medidas pertinentes en caso de que hubiese sido fraude.

El 2 de junio de 1978 el Director de la Oficina de Auditoría Interna del Fondo sometió su informe a la

Administración, señalando que existía evidencia de la posibilidad de que la reclamación de Vélez hubiese sido entablada en contravención de la Ley. Recomendó: (1) remitir copia del informe al Departamento de Justicia y a la Oficina del Contralor; y (2) de encontrarse que en efecto hubo fraude, proceder con la acción necesaria para recobrar los beneficios concedidos. Siguiendo esas recomendaciones el caso fue referido al Departamento de Justicia. Así las cosas, el 14 de febrero de 1979 el Gobernador comunicó a Vélez que ese mismo día había radicado una querella ante la Comisión para Ventilar Querellas Municipales (C.V.Q.M.), y que efectivo el 15 le suspendió de puesto y sueldo, pendiente a la ventilación de los cargos. Los dos cargos le imputaban: (1) haber radicado una reclamación falsa ante el Fondo con la intención de defraudar a dicha agencia y apropiarse ilegalmente de fondos públicos, conducta que se inició antes de ser alcalde y prosiguió luego de su elección;[1] y (2) haber cometido perjurio al negar bajo juramento que había jugado béisbol el día 6 de enero, en su declaración ante un funcionario investigador[2] del Fondo.

La C.V.Q.M. asumió jurisdicción e inició trámites. El 11 de mayo de 1979 Vélez radicó en el Tribunal Superior

---

[1] El 20 de febrero de 1979 se presentó denuncia contra Vélez, G-79-118, en el Tribunal Superior, Sala de Mayagüez por el delito de apropiación ilegal agravada (Art. 166 del Código Penal, 33 L.P.R.A. sec. 4272) y la Sec. 11a de la Ley de Beneficios por Incapacidad (11 L.P.R.A. sec. 211a). Esta última dispone:

"Cualquier persona que dé una declaración o suministre alguna información sobre algún hecho material a sabiendas de que la misma es falsa o que a sabiendas oculte algún hecho material con intención de cometer fraude para obtener algún beneficio o recibir aumento del mismo bajo este Capítulo, bien para sí mismo o para cualquier otra persona, incurrirá en la pena señalada por el Código Penal de Puerto Rico para el hurto de la cantidad de dinero así obtenida por él o por dicha otra persona; y cada una de dichas declaraciones e informaciones falsas u ocultaciones de hechos materiales constituirán un delito por separado."

Tomamos conocimiento judicial de que el 28 de enero de 1980, en juicio por jurado, Vélez fue declarado inocente del cargo imputado. Regla 11 de Evidencia.

[2] En cuanto a esta imputación no se sometió acusación.

"Demanda de Sentencia Declaratoria e *Injunction*" solicitando su restitución y la paralización de los procedimientos ante la Comisión. (³) Celebrada la correspondiente vista, el tribunal a quo desestimó el planteamiento sobre la ausencia de facultad de la Comisión para dilucidar el asunto. El 20 de junio celebró la vista sobre el *injunction* preliminar. En esa misma fecha el recurrente renunció a su cargo de alcalde. Finalmente el tribunal dictó sentencia en que denegó el *injunction* al concluir que la suspensión sumaria no fue arbitraria ni irrazonable.

No conforme, Vélez radicó escrito de apelación y revisión. Acordamos examinar sus planteamientos.

## I

El apelante recurrente señala cinco cuestiones de derecho. Tres versan sobre la jurisdicción de la Comisión para juzgarlo y si los cargos que se le imputan constituyen conducta ilegal o inmoral bajo el Art. 37 de la Ley Municipal. Advertimos que cuando Vélez Ramírez acudió al foro judicial, ya habían comenzado los trámites administrativos. El reclamo de intervención judicial a tan temprana etapa nos obliga a considerar si era necesario agotarlos, o si podían ser obviados ante el planteamiento de falta de jurisdicción. Nos inclinamos hacia la primera solución.

La Ley Municipal (⁴) en su Art. 37 crea la Comisión para Ventilar Querellas Municipales. 21 L.P.R.A. sec. 1256. Su inciso (a) reza:

---

(³) También figuraron como demandantes varios electores que votaron por él en los comicios de 1976 por sí y en representación de otros electores en igual capacidad. Aunque nunca se les certificó como representantes de la clase, continuaron en el pleito en su carácter individual. Como demandados fueron incluidos el señor Gobernador, el Secretario de Justicia y la Comisión para Ventilar Querellas Municipales, a través de sus miembros.

(⁴) Ley Num. 142 de 21 de julio de 1960 (21 L.P.R.A. sec. 1105 y ss.). El Art. 37 tiene su origen en la Ley Municipal Núm. 53 del 28 de abril de 1928, Art. 29,

El Gobernador de Puerto Rico, la Asamblea Municipal o cualquier ciudadano, podrá formular cargos al Alcalde por razón de conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones.

Tanto la doctrina de agotamiento como la de jurisdicción primaria cumplen el objetivo de mantener un adecuado balance y distribución de poder y tareas entre las agencias administrativas y el poder judicial. *Febres* v. *Feijoó*, 106 D.P.R. 676 (1978). La doctrina de jurisdicción primaria pretende determinar si corresponde a una agencia o a un tribunal la intervención *inicial* en una controversia. En cambio, la de agotamiento se dirige a dilucidar *cuándo* es el momento apropiado para que los tribunales intervengan en una controversia previamente sometida a una intervención administrativa. Por tanto, el examinar su posible aplicación surge cuando, habiendo comenzado un procedimiento o actuación en una agencia, se solicita la intervención judicial para revisar determinaciones u obtener un remedio judicial, antes de que se haya culminado todo el trámite o procedimiento administrativo establecido. *Quiñones* v. *A.C.A.A.*, 102 D.P.R. 746 (1974), y *E.L.A.* v. *12,974.78 Metros Cuadrados*, 90 D.P.R. 506 (1964).

■ La decisión de requerir o no el agotamiento no depende de criterios rígidos u objetivos, sino de si a la luz de las circunstancias del caso y pericia particular de la agencia, se entiende que la intervención judicial sería

según enmendado por las leyes Núms. 98 del 15 de mayo de 1931, 288 del 9 de abril de 1946, 55 del 18 de abril de 1950, y la 4 del 7 de diciembre de 1955.

El pasado año se aprobó la nueva Ley Orgánica para los Municipios, Ley Núm. 146 de 18 de junio de 1980, que entró en vigor el 1 de julio de 1981. En cuanto a las facultades de la Comisión para seguir ventilando los casos pendientes al entrar en vigor su Art. 13.01(c), 21 L.P.R.A. sec. 3501(c), dispuso:

"Cualquier acción civil o criminal radicada en relación a la ley derogada, y en trámite antes de la vigencia de esta ley, se continuará hasta su determinación final bajo las disposiciones vigentes al momento en que se originó la causa de acción o se cometió la violación."

prematura. El balance de poderes que debe existir entre agencias y tribunales, y la necesidad y conveniencia de tener un récord administrativo completo, aconsejan que se culminen los procesos administrativos antes del examen judicial. Davis, *Administrative Law Treatise*, St. Paul, Minnesota, West Publishing Co., 1958, Vol. 3, Secs. 19.01 y 20.01; y Davis, *Administrative Law of the Seventies*, Rochester, New York, Lawyer's Co-operative Co., 1976, Sec. 20.01.

No obstante, existen situaciones en que no es necesario agotar dichos remedios. *Vda. de Iturregui* v. *E.L.A.*, 99 D.P.R. 488, 491–492 (1970); *Quiñones* v. *A.C.A.A.*, supra; *López de Victoria* v. *Soler Favale*, 101 D.P.R. 710 (1973). Una instancia que típicamente plantea el problema es cuando se cuestiona ante el tribunal la falta de jurisdicción de la agencia sobre el asunto que está bajo su consideración. Davis, *Administrative Law Treatise*, supra, Vol. 3, Sec. 20.02. Según el profesor Davis los tribunales, y en particular el Tribunal Supremo de Estados Unidos, no han sido consistentes al evaluar el problema y no han delimitado claramente cuándo procede o no su examen. Aún así la jurisprudencia propone que se aprecien tres factores:[5] (1) el riesgo de que se ocasione un daño irreparable al afectado si el tribunal pospone su intervención dejando que prosigan los procedimientos, (2) el grado de claridad con que surja la ausencia o presencia de jurisdicción, y (3) la pericia que tenga la agencia para dilucidar

---

[5] Estos tres factores se han seguido en *State of Cal. ex rel. Christensen* v. *F.T.C.*, 549 F.2d 1321 (9th Cir. 1977), *cert.* den. 434 U.S. 876 (1977); *Casey* v. *F.T.C.*, 578 F.2d 793, 796 (9th Cir. 1978); *Marshall* v. *Able Contractors, Inc.*, 573 F.2d 1055, 1057 (9th Cir. 1978), *cert.* den. 439 U.S. 826 (1978); *Lone Star Cement Corporation* v. *F.T.C.*, 339 F.2d 505 (9th Cir. 1964); *United States* v. *Rockland Steamship Corporation*, 218 F.Supp. 509, 513 (1963); *Oil Shale Corporation* v. *Udall*, 235 F.Supp. 606 (1964); *Allegheny Airlines, Inc.* v. *Fowler*, 261 F.Supp. 508, 517–520 (1966); *Campbell Sixty-Six Express, Inc.* v. *J. & G. Express, Inc.*, 244 Miss. 427, 141 So.2d 720 (1962); *Willamette Valley Lumber Co.* v. *Ellis*, 226 Or. 543, 359 P.2d 98 (1961).

las cuestiones pertinentes a su jurisdicción. Davis, *Administrative Law Treatise*, supra, Vol. 3, Sec. 20.03, pág. 69.

Estos criterios resumen adecuadamente las consideraciones a tomarse en cuenta para decidir si aplica o no el requisito de agotamiento en el contexto de un planteamiento de falta de jurisdicción. Su utilización facilita decidir conforme a los propósitos y objetivos de la doctrina. Veamos su aplicación al caso de autos.

A. *Riesgo de daño irreparable si el tribunal pospone su intervención:*

La garantía estatutaria que brinda el Art. 37(i), 21 L.P.R.A. sec. 1256(i), de que todo alcalde a quien, previa formulación de cargos, la Comisión resuelva destituirlo, tiene derecho a obtener revisión judicial directa ante este Tribunal, [6] minimiza el riesgo de que al recurrente se le ocasionen daños irreparables por la posposición del examen judicial de la cuestión jurisdiccional.

En primer término, en mayor o menor grado los costos económicos y sociales del procedimiento administrativo son un riesgo inherente en este tipo de proceso, prospere o no la defensa de falta de jurisdicción. El requerir su agotamiento no depende de la inversión en sí, sino de la probabilidad de que la misma sea en vano porque, en efecto, la agencia carece de jurisdicción. Esto a su vez depende de la *claridad* con que surja la cuestión jurisdiccional en esa etapa de los procedimientos.

En segundo lugar, el peligro de que el simple transcurso del tiempo y el someterse al proceso vayan a perjudicarle indebidamente es mínimo. Aunque se nos argumenta que los procedimientos ante la Comisión suelen ser lentos, no se ha demostrado que no puedan aligerarse o

---

[6] Aunque los electores recurrentes no tienen un derecho a solicitar revisión de la decisión de la Comisión, nada impediría que radicaran una acción como la presente y reprodujeran los planteamientos pertinentes cuando se emita dicha decisión.

que ello de por sí ocasione algún perjuicio particular. No existen indicios de que vayan a disminuir las oportunidades de reproducirse el planteamiento jurisdiccional en su oportunidad. Tampoco hay evidencia de que Vélez Ramírez tenga que mantenerse sometido al proceso de destitución hasta su culminación. Los hechos han demostrado que los efectos de la querella sobre su carrera política son mínimos.[7]

B. *El grado de claridad sobre ausencia o presencia de jurisdicción:*

La doctrina acepta que cuando surge claramente que no hay jurisdicción, ningún beneficio se obtiene obligando al litigante a mantenerse en la agencia hasta culminar el proceso. No es entonces necesario consumir los remedios. Davis, *Administrative Law Treatise*, supra, Vol. 3, Sec. 20.01. Requerirlo en esas circunstancias sería una futilidad en términos de tiempo y dinero, porque finalmente el foro judicial, con toda probabilidad, invalidaría el proceso. Así, en la medida que la cuestión jurisdiccional es menos clara y disminuyen estos riesgos, es adecuado compeler a que se agoten dichos remedios. Robustece este enfoque que en esa etapa el tribunal tiene a su disposición el récord y beneficio de la adjudicación final efectuada por la agencia, que es la entidad especializada en el asunto.

En el caso de autos, estamos ante un estatuto creado específicamente para ventilar y adjudicar cargos contra los alcaldes. Esa encomienda es clara y su ámbito definido. La ausencia de jurisdicción no es evidente. Por el contrario, depende de precisar y dirimir unos hechos no adjudicados hasta el momento. El determinar si los cargos radicados imputan "conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de

---

[7] Tomamos conocimiento judicial de que Vélez Ramírez fue electo nuevamente alcalde en las elecciones generales del 1980, cargo que actualmente ocupa.

sus funciones", es un asunto que está sujeto al proceso de interpretación. ¿Cuán restrictivamente o amplio deben ser interpretados estos términos? ¿Son la conducta y actuaciones imputadas inmorales? ¿Son ilegales? ¿Implican abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos? La frase "en el desempeño de sus funciones" según usada en el Art. 37, ¿comprende actuaciones necesariamente ocurridas durante el tiempo que se ejerce el cargo o aquellas cometidas antes de ocupar la posición de alcalde, pero con efectos posteriores? Además, Vélez Ramírez aduce que la Comisión no puede tener jurisdicción en este caso porque (1) corresponde al Fondo hacer la determinación de compensabilidad de un accidente del trabajo, de acuerdo al espíritu de liberalidad que anima a la Ley, y sujeto al derecho del obrero de obtener revisión en la Comisión Industrial y el Tribunal Supremo; y (2) que el Fondo determinó que el querellado recurrente tenía derecho a recibir compensación y no ha revocado esa determinación, la cual constituye cosa juzgada.

■ La interrogantes planteadas y demás señalamientos nos mueven a concluir que si bien la Comisión tiene jurisdicción para ventilar los cargos contra Vélez Ramírez, no está meridianamente claro el ámbito de su facultad en las circunstancias singulares del caso. Hay una variedad de factores a considerar en relación con la cuestión, que aconsejan sean precisados en su origen por la Comisión.[8]

C. *La pericia de la agencia para dilucidar las cuestiones pertinentes a su jurisdicción:*

■ La Comisión fue creada específicamente para entender en los procedimientos disciplinarios de los alcaldes. *Rodríguez Rivera, Alcalde* v. *Comisión,* 84 D.P.R. 68

---

[8] Vélez radicó ante la Comisión una "Moción de desestimación" en la que hizo sustancialmente los planteamientos sobre jurisdicción luego reproducidos ante el Tribunal Superior y este foro. Dicha moción no había sido resuelta cuando radicó su demanda, ni cuando se perfeccionaron los presentes recursos. No contamos con el beneficio de una opinión y discusión de la C.V.Q.M.

(1961). Presuntivamente está particularmente facultada para determinar lo que es "conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos, en el desempeño de sus funciones". El dictamen de si existe o no jurisdicción dependerá en gran medida del ejercicio de su pericia administrativa. *McKart* v. *United States*, 395 U.S. 185, 193-194 (1969); *Myers* v. *Bethlehem Corp.*, 303 U.S. 41 (1938).

Aunque podría argumentarse que el caso envuelve una interpretación estatutaria —función por excelencia de los tribunales— lo cierto es que en la medida en que la Comisión interprete dicha disposición, afectará su jurisdicción. Por consiguiente, debe ser ella, como organismo especialmente creado para adjudicar las querellas contra los alcaldes, la que intervenga y decida en primera instancia.

En síntesis, no están presentes las condiciones necesarias que excusan agotar el remedio administrativo ante un reclamo de falta de jurisdicción. Hasta lo posible —velando desde luego la protección de los intereses en juego— hemos de mantener un adecuado balance entre los poderes de las agencias y los tribunales, evitando una prematura intromisión. *Myers* v. *Bethlehem Corp.*, supra; *United States* v. *Utah Const. and Mining Co.*, 384 U.S. 394 (1966). Después de todo, la norma de preferir el agotamiento de la acción administrativa es una conveniencia compatible con la justicia, que no margina el escrutinio final por los tribunales. *Febres* v. *Feijoó*, supra, págs. 681-682; *González Saldaña* v. *Tribunal Superior*, 92 D.P.R. 477, 487 (1965).

## II

El recurrente nos señala que el derecho al voto, protegido por el Art. II, Sec. 2 de la Constitución de Puerto Rico, no tolera que se prive a un alcalde de su puesto libremente elegido en elección popular, por actos desvin-

culados de éste. No podemos evaluar en sus méritos esta conclusión.

■ Primero, la impugnación constitucional de actuaciones administrativas está sujeta a la norma del agotamiento de los remedios administrativos. *DuBois Clubs* v. *Clark*, 389 U.S. 309 (1967). Aunque las agencias administrativas no pueden dilucidar la constitucionalidad de la ley que las crea, sí pueden determinar si su aplicación a los hechos específicos de un caso sería inconstitucional. Davis, *Administrative Law Treatise*, supra, Vol. 3, Sec. 20.04, pág. 74. En principio, la Comisión, por consiguiente, tendría facultad para desestimar o declarar sin lugar una querella al estimar que una destitución por motivo de determinada conducta —ya establecida— sería inconstitucional.

■ Segundo, el señalamiento no supera exitosamente la norma de abstención judicial sobre entender en cuestiones constitucionales a menos que sea necesario. *Galarza Soto* v. *E.L.A.*, 109 D.P.R. 179, 180, escolio 1 (1979); *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 596 (1958). No es apropiado explorar esa dimensión hasta que se hayan determinado los hechos y si procede la destitución. Esa tarea exige un balance de los intereses en pugna y precisa conocer todos los pormenores y circunstancias que rodean la conducta de Vélez Ramírez. Rechazamos resolver la cuestión en el abstracto, o en ausencia de un récord administrativo completo. Máxime en casos como el de autos, en que su adjudicación requiere el ejercicio de discreción administrativa para dirimir credibilidad de testigos. Davis, *Administrative Law Treatise*, supra, Vol. 3, Sec. 20.01, págs. 642–643 (Supl. 1970); *McKart* v. *United States*, supra, págs. 193–194. Por último, no estamos tampoco ante un reclamo de un remedio que la agencia no pueda conceder.

En atención a los fundamentos expuestos, concluimos que no erró la ilustrada sala sentenciadora al negarse a conceder el remedio declarativo e *injunction*.

## III

■ Finalmente concentremos nuestra atención en analizar la contención de si la suspensión sumaria del cargo y empleo decretada por el Gobernador violó el debido proceso de ley garantizado en el Art. II, Sec. 7 de la Constitución de Puerto Rico y las Enmiendas V y XIV de la Constitución de Estados Unidos.

Distinto al enfoque anterior, para atender el señalamiento no es menester que haya mediado una adjudicación previa por la Comisión, pues el asunto gira sobre la decisión del Primer Ejecutivo al momento de formular los cargos, actuación que hace a la luz del expediente investigativo y demás constancias que en ese momento posee. La suspensión de empleo y sueldo tiene unos efectos negativos inmediatos sobre el funcionario y son de tal naturaleza que excluyen la apreciación de la norma de abstención. Corresponde, pues, a los tribunales y no a la Comisión el determinar si la suspensión sumaria al amparo de la Constitución viola o no el debido proceso de ley. Veamos.

■ El Art. 37(j) vigente para la fecha de los cargos disponía:

> Al tiempo de formular los cargos contra el Alcalde o en cualquier momento posterior, *si a su juicio así conviene a los intereses del municipio*, el Gobernador podrá decretar la suspensión de empleo y sueldo del Alcalde hasta que el caso sea resuelto en definitiva. (Énfasis suplido.) 21 L.P.R.A. sec. 1256(j).

El texto legal transcrito claramente autoriza al Gobernador a decretar la suspensión de empleo y sueldo de un alcalde, luego de habérsele formulado cargos, hasta que se diluciden los mismos. Esta facultad es constitucionalmente válida. *Fugate* v. *Weston*, 157 S.E. 736 (1931); McQuillin, *Municipal Corporation*, 3ra ed., 1979, Vol. 4, Secs. 12.229 a 12.231. Ello no significa que el poder del Gobernador sea absoluto e ilimitado. Ninguno lo es en nuestro ordenamiento

jurídico. *Warner Lambert Co.* v. *Tribunal Superior*, 101
D.P.R. 378 (1973); *Santa Aponte* v. *Srio. del Senado*, 105
D.P.R. 750, 764 (1977). El mismo lenguaje de ley limita al
Gobernador su facultad de suspensión a aquellos casos en
que ésta es conveniente para los mejores intereses del muni-
cipio. Al ejercer entonces ese poder no puede violentar el
debido proceso de ley.

 Hemos resuelto que el debido proceso de ley no
requiere que haya una vista previa a toda privación de un
derecho o interés propietario. Cuando hay una privación
temporal basta que en algún momento significativo u
oportuno el afectado tenga la oportunidad de defenderse y
presentar su caso en un proceso con adecuadas garantías.
Se reconoce que hay ocasiones en que el Estado tiene algún
interés de importancia que exige la intervención temporal
con la propiedad o libertad de una persona antes de que
pueda brindársele la oportunidad de ser oído. La doctrina
informa que para determinar si el tipo de vista concedida
y el momento en que se brinda son constitucionalmente
aceptables, hay que analizar conjuntamente los intereses
gubernamentales y los de la persona afectada. *Rodríguez* v.
*Tribunal Superior*, 104 D.P.R. 335 (1975); *Domínguez
Talavera* v. *Tribunal Superior*, 102 D.P.R. 423 (1974);
*Mathews* v. *Eldridge*, 424 U.S. 319 (1976); *Arnett* v.
*Kennedy*, 416 U.S. 134 (1974); Davis, *Administrative Law
Treatise*, 2da ed., San Diego, K.C. Davis Pub. Co., 1979,
Vol. 2, Secs. 11:12 y 12:14, págs. 388–395 y 462–463.

 *Mathews* v. *Eldridge*, supra, articuló tres factores
a ser seguidos para examinar cuándo el debido proceso de
ley no permite suspender o destituir a una persona de un
puesto sin darle derecho a una vista previa. Davis,
*Administrative Law Treatise*, 2da ed., supra, Vol. 2, Sec.
13:12, págs. 509–512; Lawrence H. Tribe, *American Consti-
tutional Law*, New York, The Foundation Press, 1978, pág.
540; H. Friendly, *Some Kind of Hearing*, 123 U. Pa. L.
Rev. 1267 (1975). Los factores son: (1) los intereses

afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas; y (3) el interés gubernamental protegido con la acción sumaria, inclusive la función de que se trata y las cargas fiscales y administrativas que conllevaría el imponer otras garantías procesales. Examinamos estos factores.

A. *Los intereses afectados por la acción de suspensión:*

La suspensión sumaria privó al recurrente de sus derechos de propiedad como lo son el sueldo y beneficios marginales, además de ejercer el cargo para el cual fue electo en las elecciones generales de 1976. *Paul* v. *Davis*, 424 U.S. 693 (1976); *Fuentes* v. *Shevin*, 407 U.S. 67 (1972). Éstos, desde luego, no fueron los únicos daños envueltos. Adviértase que se trata de un funcionario seleccionado en elecciones generales, que recibió la confianza de los electores del Municipio de Lajas luego de que las actuaciones imputadas en los cargos fueran ampliamente debatidas en el foro político. *Robledo, Alcalde* v. *C.V.Q.M.*, 95 D.P.R. 1, 13 (1967).

Nuestra Constitución en su Art. II, Sec. 2 garantiza el derecho al sufragio universal, igual, directo y secreto. Protege además al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. El derecho al voto en todas sus manifestaciones representa el corazón de un gobierno democrático. *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980); *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248 (1980); *P.P.D.* v. *Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *P.P.D.* v. *Barreto Pérez*, 110 D.P.R. 376 (1980); *P.S.P.* v. *Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980). Esas garantías conllevan que en última instancia el voto individual tenga realmente un valor y eficacia en la selección de determinados candidatos a puestos públicos, que se configura al sumarse con la voluntad de otros ciudadanos.

Los comicios de 1976 demostraron que la voluntad de la ciudadanía fue que Vélez Ramírez dirigiera los destinos del municipio por los próximos cuatro años. Éste, por consiguiente, tenía la obligación de acatar ese mandato. Su suspensión sumaria le impidió cumplir con esa obligación. Afectó el ejercicio de la franquicia electoral y privó de sus servicios como alcalde a los que por él votaron. Indudablemente que los intereses afectados por la destitución sumaria son de gran envergadura e importancia. El hecho de que fuera sustituido por otra persona de su mismo partido no milita en contra, pues ello no subsana sus derechos personales afectados y tampoco libera de perjuicio el derecho al voto. Mientras más fuerte sea el interés individual afectado y mayor respaldo social y constitucional tenga, el debido proceso de ley se torna más exigente. *Addington* v. *Texas*, 441 U.S. 418 (1979).

Las consideraciones expuestas deben estimarse en el contexto del planteamiento en cuanto a la destitución sumaria. No implica que estamos adelantando nuestro criterio sobre cuál debe ser el desenlace final, de probarse los cargos. Tampoco representa que estamos adelantando juicio alguno sobre la aplicabilidad al caso de la doctrina jurisprudencial adoptada en *Winship, Gobernador* v. *Asamblea Mpal.*, 53 D.P.R. 138, 147 (1938), que, citando de *State* v. *Welsh*, 79 N.W. 369 (1899), rechaza la tesis de absolución por hechos cometidos e imputados en una administración pasada a base de que el electorado reeligió al funcionario, pues:

> "el objeto principal de una remoción es librar a la comunidad de un funcionario corrupto, incapacitado e indigno de confianza. Sus actuaciones durante su mandato anterior revelan tan eficazmente que puede calificársele de tal, lo mismo que las del término en que está sirviendo. La reelección no condona el delito. La conducta ofensiva puede que no haya sido descubierta con anterioridad a su elección, y, sea ello como fuere, no había sido establecida en la forma prevista por el estatuto."

B. *El riesgo de una suspensión errónea:*

La función revisora judicial no puede limitarse a determinar si la decisión del Gobernador de suspender sumariamente de empleo y sueldo a un alcalde conviene a los intereses del municipio, considerando únicamente una evaluación de los cargos imputados y tomándolos como ciertos. Ese enfoque restrictivo representaría un criterio inaceptable, pues prácticamente convertiría al Gobernador en árbitro absoluto y único de los destinos municipales, privando a los perjudicados del derecho de acudir a los tribunales para impugnar esa actuación.

En esa tarea el Poder Judicial debe evaluar el cuadro integral que tuvo a su disposición el Gobernador al momento de adoptar su decisión. Veamos los factores presentes a la fecha de su suspensión: (1) el recurrente había actuado como alcalde por aproximadamente treinta y nueve (39) meses luego de su reclamación al Fondo; (2) los hechos que motivaron los cargos era un suceso conocido en los círculos políticos desde muy temprano; (3) el período que transcurrió entre la reclamación y la radicación de los cargos fue extenso; (4) el Contralor había intervenido con tres años de la administración de Vélez Ramírez y no había encontrado irregularidad alguna en el manejo de los fondos públicos; y (5) todos los informes que fueron rendidos en cuanto a la investigación que precedió a la formulación de los cargos y la suspensión, por los investigadores del Fondo y del Departamento de Justicia, demostraban que la evidencia —consistente de diferentes declaraciones juradas— era conflictiva en cuanto a cómo en verdad había ocurrido el accidente.

A poco que reflexionamos nos convencemos de que estos factores presentan una seria y verdadera controversia en cuanto al resultado final de los hechos imputados. Generalmente se reconoce que cuando existe controversia en cuanto a los hechos importantes, éstos *no* deben ser adjudicados, aunque sea provisionalmente, sin concederse a

734

la persona perjudicada la oportunidad de rebatirlos. La situación es más importante cuando la evidencia en contra del individuo, como la de autos, es de naturaleza testifical. *Goldberg* v. *Kelly*, 397 U.S. 254 (1970); *Greene* v. *McElroy*, 360 U.S. 474, 496–497 (1959); *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 439 U.S. 96 (1978).

■ Ante este cuadro fáctico opera la decisión del Gobernador de suspenderlo. ¿Era tal curso de acción conveniente para los mejores intereses del municipio? Ciertamente existía controversia sobre la veracidad de los hechos en pugna. De igual modo el inventario preliminar del total de las circunstancias descritas no es del todo claro. Es razonable, pues, concluir que al momento de la suspensión existía riesgo de que ésta se hiciera en forma errónea. [9]

C. *El interés gubernamental protegido con la destitución y suspensión sumaria:*

En *Robledo*, supra, reconocimos los intereses tutelados cuya protección se le encomienda a la Comisión salvaguardar al optar por destituir un alcalde:

> La forma en que está redactado el estatuto sugiere que el criterio rector para la destitución no participa de naturaleza punitiva para el incumbente sino que responde al propósito de evitar lesiones al interés público. La medida debe propender al mejoramiento del servicio público, y por tanto debe tratarse de conducta detrimental para la disciplina y eficiencia de la función pública. . . . la actuación del querellado [tiene que haber] afectado en forma sustancial e irremediable el funcionamiento del régimen municipal. Pág. 13.

En igual sentido en *Díaz* v. *Charneco*, 48 D.P.R. 536, 540 (1935), citando de *Words & Phrases Judicially Defined*,

---

[9] Los casos de *Levesque* v. *State of Me.*, 587 F.2d 78 (1978); *Arnett* v. *Kennedy*, supra; y *Comisionado de Seguros* v. *Tribunal Superior*, 100 D.P.R. 546 (1972), citados por el tribunal de instancia son en sus hechos muy distintos y distinguibles al de autos.

dijimos que la causa es "legal y no cualquier causa que la asamblea pueda considerar suficiente. La causa debe ser una que se relacione especialmente y que afecte la administración del cargo y debe limitarse a algo de naturaleza substancial y que afecte directamente los derechos e intereses del pueblo. La causa debe tener íntima relación con la idoneidad del funcionario o con el desempeño de sus deberes, demostrativa de que él no es una persona apropiada para el cargo".

En resumen, la destitución pretende proteger al municipio contra una administración de los fondos y bienes públicos fraudulenta, corrupta e irresponsable y del abuso de los poderes inherentes al cargo de alcalde. Como corolario lógico, iguales fines persigue una suspensión sumaria del Gobernador.

Se advierte, sin embargo, una diferencia en cuanto a la destitución por la Comisión y la suspensión por el Gobernador. En la primera, el Art. 37(d) requiere vista previa y en la otra no, aunque tampoco se obliga al Gobernador a suspender a los alcaldes inmediatamente después de radicar los cargos, sino que lo faculta para hacerlo en ese momento o en cualquiera otro posterior. Si no lo suspende inmediatamente puede hacerlo después.

La jurisprudencia reconoce una serie de situaciones donde el interés protegido es de tal intensidad y naturaleza que es innecesaria una vista previa: la confiscación y destrucción de alimentos inadecuados para el consumo humano, *North American Storage Co.* v. *Chicago*, 211 U.S. 306 (1908); el hacerse cargo de una sucursal bancaria cuando su operación es ilegal y no es segura por ser la gerencia inadecuada, siendo la situación capaz de causar daño a los acreedores y al público, *Fahey* v. *Mallonee*, 332 U.S. 245, 253 (1947); la incautación de mercancía con etiquetas engañosas, *Ewing* v. *Mytinger & Casselberry*, 339 U.S. 594, 599 (1950); la determinación de causa probable para arrestar, *Gerstein* v. *Pugh*, 420 U.S. 103 (1975); el

embargo de una cuenta bancaria, *North Georgia Finishing, Inc.* v. *DIChem, Inc.*, 419 U.S. 601 (1975); la confiscación de un barco con evidencia delictiva, *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974); la terminación de los beneficios por incapacidad bajo la ley de seguro social, *Mathews* v. *Eldridge*, supra.

En contrario, existen instancias en que la vista previa es necesaria. Así por ejemplo: el retirar beneficios a familias con dependientes cuando quedan en total indefensión económica, *Goldberg* v. *Kelly*, supra; cuando se va a embargar una porción del salario, *Sniadach* v. *Family Finance Corp.*, 395 U.S. 337 (1969); la confiscación por litigantes privados sin la participación cabal de un juez, *Fuentes* v. *Shevin*, supra; *Mitchell* v. *W. T. Grant Co.*, 416 U.S. 600 (1974).

Esa jurisprudencia nos permite detectar la idea primordial detrás del criterio que justifica las actuaciones sumarias sin la previa celebración de vista, a saber, la existencia de una urgencia suficientemente fuerte, capaz de pasar sobre los derechos de una parte y permitir una pérdida temporal de los mismos. Los intereses encontrados deben ser balanceados. Davis, *Administrative Law Treatise*, supra, 2da ed., Vol. 2, Sec. 11:12, pág. 391. Al pesar los criterios en disputa en búsqueda de ese balance, debe considerarse la función envuelta, las cargas fiscales y administrativas, y las garantías anteriores y posteriores que se le conceden a la parte afectada con la suspensión sumaria. Entre los posteriores, es de singular importancia si existe el derecho a una vista rápida donde se diluciden los cargos o actuaciones imputadas. *Mitchell* v. *W. T. Grant Co.*, supra, pág. 607; *Goss* v. *López*, 419 U.S. 565 (1975); *Barry* v. *Barchi*, 443 U.S. 55 (1979).

Con referencia al estatuto ante nos, notamos como garantías anteriores a la suspensión que el Art. 37 requiere la formulación de cargos ante la Comisión. Además, la evidencia que tenga el Gobernador ante sí debe

ser suficiente, capaz de demostrar que a su juicio tal proceder conviene a los mejores intereses del municipio. Regla 9 de Evidencia; Art. 37 (e).[10] Desde luego, ello no quiere decir que el juicio debe ser exclusivo del Ejecutivo de turno. Sino que debe ser representativo de una persona prudente y razonable, que ante evidencia suficiente pueda concluir que el alcalde debe ser suspendido por resultar beneficioso a los mejores intereses del municipio.

Una vez adoptado ese curso de acción sin celebración previa de vista, las garantías posteriores son de vital importancia. El Art. 37 reconoce cuatro fundamentales. *Primera*, notificación de los cargos imputados. *Segunda*, el derecho a contestarlos por escrito dentro de 10 días y la oportunidad para comparecer y defenderse por sí o por medio de abogados. *Tercera*, facultad de la Comisión para pasar juicio sobre la suspensión sumaria antes de entrar a examinar en su fondo los cargos. Aunque de la faz del Art. 37 no se desprende expresamente que la Comisión tenga esa facultad, en estricta interpretación judicial hay que admitir que implícitamente la tiene. Dos razones así lo demuestran, a saber: (1) el Art. 37(d) faculta a la Comisión para —si estimare que los cargos son frívolos e insuficientes o de su faz resultare que no conllevan conducta inmoral o actuaciones ilegales que impliquen abandono, negligencia inexcusable o conducta lesiva a los mejores intereses públicos en el desempeño de sus funciones— desestimar los cargos *sin celebración de vista;* y (2) si la Comisión, al momento de evaluar el pliego de cargos o en cualquier momento posterior determina que aun considerando los cargos imputados como ciertos, éstos representan una actuación ilegal de carácter leve —lo cual según el

---

[10] Para la Comisión, como la destitución es permanente, la evidencia debe ser clara: Antieau, *Municipal Corporation Law*, New York, Matthew Bender, 1979, Vol. 2A, Sec. 22.163, pág. 22-245; *De Castro* v. *Junta de Comisionados*, 57 D.P.R. 153, 163 (1940). Además la actuación tiene que haber "afectado en forma sustancial e irremediable el funcionamiento del régimen municipal". *Robledo*, supra, pág. 13.

inciso (e) del Art. 37 no permite la destitución de un alcalde— se hace innecesario mantener la suspensión sumaria y debe ordenar que se deje sin efecto y disponer la restitución con todos los beneficios como si nunca se hubiese suspendido y continuar con los procedimientos. Y *cuarta*, en la vista se debe llevar un récord de todo lo sucedido.

La jurisprudencia ha refrendado la validez de trámites análogos al expuesto. Así, en *Domínguez Talavera* v. *Tribunal Superior*, 102 D.P.R. 423 (1974), sostuvimos la validez de un embargo sin vista previa autorizado por el Art. 6 de la Ley de Ventas Condicionales, 10 L.P.R.A. sec. 36, y la Regla 56 de las de Procedimiento Civil de 1958, debido a las garantías presentes, anteriores y posteriores a un embargo, tales como (1) la participación judicial; (2) la prestación de fianza por la parte embargante; (3) la facultad de levantar el embargo; y (4) el derecho del deudor a una vista rápida para cuestionar el embargo.

En el caso de autos la decisión en juego es de igual carácter. La única diferencia detectable es la forma en que se evalúa unilateralmente y en forma *ex parte* la evidencia a disposición del Gobernador. En ciertas instancias ello podría tornar en efímero el requisito de la "evidencia suficiente", lo que produciría que la suspensión sumaria —en comparación con la envergadura de los cargos imputados— fuera irrazonable. Ello impone a los tribunales una obligación especial al revisar decisiones de esta índole. *Cf.* Davis, *Discretionary Justice*, Baton Rouge, La. State Univ. Press, 1969; *Hernández Denton* v. *Quiñones Desdier*, 102 D.P.R. 218 (1974).

## IV

Al retrotraernos al momento de la suspensión y aplicar balanceadamente los tres factores antes enunciados y evaluados, surgen en nuestro ánimo serias reservas sobre si la suspensión del recurrente fue razonable y procedía.

Primeramente, hemos visto que los derechos afectados eran de gran envergadura e importancia. Segundo, el cuadro total de las circunstancias que tuvo ante sí el Gobernador al suspenderlo no era totalmente claro. Existía un gran riesgo de que la base probatoria de la investigación —de carácter testifical y conflictiva— lo llevara a actuar en forma errónea. Tercero, el mantener al recurrente en su puesto no representaba ninguna carga fiscal ni administrativa para el Municipio de Lajas ni para el Gobierno de Puerto Rico. Éste llevaba trabajando satisfactoriamente, *según el Contralor*, tres años. Cuarto, había transcurrido un período extenso entre la acción ilegal imputada y la radicación de los cargos. ¿Estaba revestida entonces de tal urgencia la suspensión que no admitiera esperar a que la Comisión hiciera la determinación inicial de si los cargos eran frívolos e insuficientes o no, o si se trataba de una actuación ilegal de carácter leve que no ameritara tal sanción?

No es necesario contestar ahora estas interrogantes. Los autos reflejan que el recurrente renunció a su puesto el 20 de junio de 1979, esto es, cuatro (4) meses y cinco (5) días después de su suspensión. Esa conducta resulta totalmente incompatible con el reclamo de un remedio urgente en sus dimensiones procesal y sustantiva. El período eleccionario por el cual fue suspendido expiró. Fue electo nuevamente para este cuatrienio. Como parte de este pleito judicial sobre sentencia declaratoria e *injunction* quedan pendientes de adjudicar los emolumentos dejados de percibir por tan corto período, pues la suspensión de empleo y sueldo es un trámite accesorio al procedimiento principal, supeditado a éste y condicionado, para ser válido y tener efecto desde su origen, a que ocurra una destitución válida, final y firme. *Ramírez* v. *Municipio*, 72 D.P.R. 364, 368 (1951). En estas circunstancias aplica la doctrina de agotamiento. El Poder Judicial debe ceder para que el foro administrativo dilucide y adjudique si Vélez Ramírez

incurrió o no en conducta prohibida por la Ley Municipal que ameritaba su destitución. La decisión es importante. En la medida en que oportunamente pueda recaer un dictamen final y firme en su contra, se afectan no sólo los salarios no devengados, sino su futuro político y su capacidad para poder ocupar o ser nombrado para puestos públicos.

*Se dictará sentencia confirmatoria y se devolverán los autos para trámite ulterior ante la Comisión compatible con lo resuelto.*

Los Jueces Asociados Señores Torres Rigual y Díaz Cruz concurren en el resultado sin opinión.