WILLIAM TORRES SOLANO, querellante y recurrido, *v.* PUERTO RICO TELEPHONE COMPANY, querellada y recurrente.

*Número:* CE-87-713          *Resuelto:* 28 de junio de 1991

*José Luis Verdiales Morales, Jay A. García Gregory, Carlos V. J. Dávila* y *José J. Santiago,* abogados de la Puerto Rico Telephone Company; *Jorge E. Pérez Díaz, Procurador General, Anabelle Rodríguez, Procuradora General Auxiliar,* y *Blanca A. Díaz Segarra, Procuradora General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico; *Jaime Luciano Jiménez,* abogado del recurrido.

## RESOLUCIÓN

Examinada la moción de reconsideración del Procurador General de Puerto Rico y las mociones de reconsideración de la Puerto Rico Telephone Company y del Sr. William Torres Solano, el Tribunal dispone no ha lugar.

Lo acordó el Tribunal y certifica el señor Sub-Secretario. El Juez Asociado Señor Negrón García disintió mediante opinión escrita. El Juez Asociado Señor Hernández Denton no intervino.

*(Fdo.)* Heriberto Pérez Ruiz

*Sub-Secretario*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

(En reconsideración)(*)

Este es un caso de *PRETERICIÓN JUDICIAL Y DE ADJUDICACIÓN CONSTITUCIONAL HIPOTÉTICA.* Debemos reconsiderar la opinión y sentencia de 20 de noviembre de 1990, *Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990). *"El juez no debe prejuzgar, debe conocer en profundidad lo acontecido para poder aproximarse a la verdad.* Hegel, en un magnífico ejemplo, nos aclara el tema diciendo: 'La investigación de un acontecimiento no puede tener lugar de otro modo que conociendo; investigarlo no significa otra cosa que conocerlo. *Mas querer conocer antes de conocer es tan absurdo como aquel prudente propósito del escolástico que quería aprender a nadar antes de aventurarse en el agua.'"* (Énfasis suplido.) D.T. Cairnie Cora-

---

(*) Los *serios planteamientos* del Procurador General de Puerto Rico —revestidos de interés público— en consciencia, nos obligan a participar en esta etapa.

llini, *El juez frente a la verdad y la certeza de su fallo: único camino a seguir*, 1980 (Núm. 853) Rev. Not. 2041, 2048 (1980). No era *justiciable* ni *necesario* resolver cuestión constitucional alguna en torno a las Sec. 4.6(4) de la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1336(4), y la Sec. 9.2 del Reglamento de Personal de la Oficina Central de Administración de Personal (Reglamento de la O.C.A.P.). Por ende, fue totalmente especulativo decidir el caso aplicando con carácter retroactivo la doctrina de *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). Examinemos estas conclusiones.

## I

*Preterición judicial del Estado*

Es imperativo *dejar sin efecto* ese decreto de inconstitucionalidad. Sin excusas se omitió incluir al Estado, interventor indispensable, conforme la Regla 21.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Dispone:

> Siempre que la *constitucionalidad* de una ley, orden ejecutiva, franquicia o *reglamento* administrativo del Estado Libre Asociado de Puerto Rico *se impugnare* en *algún pleito* en que éste o algún funcionario o agencia del mismo no fuere parte, *el tribunal ordenará que se notifique dicha impugnación al Secretario de Justicia y permitirá la intervención del Estado Libre Asociado de Puerto Rico.* (Énfasis suplido.)

Este texto no admite dudas. Reconoce la calidad de interventor del Estado en *cualquier pleito* en que se cuestione la constitucionalidad de una ley, orden, etc. Por interacción de la Regla 21.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, esa intervención es como "*cuestión de derecho*" y de carácter "*incondicional*".

No obstante, la opinión original pretendió circunvalar este mandato y redujo el derecho del Estado a intervenir a una simple nota al calce. En el esc. 9 se dijo:

El 17 de junio de 1986, la Oficina Central de la Administración de Personal (O.C.A.P.) emitió la Carta Normativa Núm. 1-86, dirigida a los señores Secretarios del Gobierno (*incluso al Secretario de Justicia*), Jefes de Agencias, Directores de Corporaciones Públicas y Alcaldes, Sistema de Personal y Agencias excluidas de la Ley de Personal del Servicio Público de Puerto Rico, que proveía para una vista informal en los casos de suspensión de empleo y sueldo o destitución, *y acogía lo resuelto en el caso de Cleveland Board of Education v. Loudermill*, supra. *Tal actuación es un reconocimiento por la Rama Ejecutiva del defecto constitucional de las disposiciones legales cuya constitucionalidad está en controversia en el caso de autos.* (Énfasis suplido y en el original.) *Torres Solano v. P.R.T.C.*, supra, pág. 525 esc. 9.

Dicho con respeto, en sus dimensiones procesales y sustantivas este argumento es *INCREÍBLE*.

*Procesalmente*, instaura la novedosa regla de que será el tribunal ante quien se ventila la controversia el que decida —sin darle notificación previa al Estado— si la intervención y comparecencia es o no necesaria, ignorando así la Regla 21.3 de Procedimiento Civil, *supra*. Desconocemos qué elementos de juicio nutrirán ese "discernimiento" judicial. Ciertamente, su implantación conllevará dos graves peligros: (1) el tener el tribunal que prejuzgar si está inclinado a sostener o anular la constitucionalidad del asunto en controversia, y (2) el situarlo en una posición de supremacía absoluta y total sobre los restantes poderes. "Todo poder gubernamental es un poder prestado pero el que tiene un juez sobre nosotros constituye un préstamo con condiciones muy precisas: estas condiciones son la ley." (Traducción nuestra.) C. Fried, *Order and Law*, Nueva York, Ed. Simon & Schuster, 1991, pág. 59.

En lo *sustantivo, oblitera* varios principios de sana adjudicación constitucional. A partir de la opinión desapareció de nuestro ordenamiento la *premisa* de que toda ley es constitucional. Quedó también descartado el atributo de que sólo este Tribunal Supremo podía, *erga omnes*, declarar una ley inconstitucional. Bastará simplemente

una carta normativa de un funcionario ejecutivo al efecto. Conforme la misma norma, la observancia y acatamiento de esa carta en el ámbito administrativo será suficiente evidencia de "allanamiento" o "reconocimiento" de inconstitucionalidad, que obligará a *todo* el Poder Ejecutivo, incluso al Secretario de Justicia.

## II

*Adjudicación Constitucional Hipotética*

De la lectura de la opinión de 20 de noviembre de 1990, no cabe otra conclusión que aceptar que se forzó indebidamente el pronunciamiento de inconstitucionalidad. Analicemos sucintamente su contenido y lógica interna.

De entrada, notamos que se *entremezclaron* dos (2) razones para decidir. La primera invocó a *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716 (1982), y se aplicaron —como veremos, incorrectamente— los tres (3) criterios allí pautados para evaluar si se había violado el debido proceso de ley. *Torres Solano v. P.R.T.C.*, supra, págs. 521–522.

Acto seguido, *sin necesidad*, se introdujo a *Cleveland Board of Education v. Loudermill*, supra, y se expresaron algunas normas al respecto. *Torres Solano v. P.R.T.C.*, supra, págs. 523–524. Después, se procedió a declarar inconstitucional el Art. 12.3 del Reglamento de Personal de la Puerto Rico Telephone Company (Telefónica) y también, *sin necesidad*, las Sec. 4.6(4) de la Ley de Personal, *supra*, y la Sec. 9.2 del Reglamento de la O.C.A.P.

¿Por qué este injerto judicial? Si el caso era adjudicable bajo *Vélez Ramírez v. Romero Barceló*, supra, ¿qué justificación hubo para hablar y pautar sobre la norma de vista previa informal al amparo de *Cleveland Board of Educa-*

*tion v. Loudermill*, supra? A la luz del trasfondo fáctico, a juicio nuestro, ninguna. Expongámoslo.

## III

*Trasfondo Fáctico*

El *31 de mayo de 1984*, aproximadamente a las 8:30 A.M., William Torres Solano —empleado gerencial de la Telefónica— irrumpió bruscamente en la oficina de *su supervisor*, Ing. Juan Negrón, a la sazón reunido con su compañero de trabajo Manuel Nuño Gorbea. *Sin provocación alguna*, Torres Solano golpeó *con el puño* a Nuño Gorbea, *quien cayó al piso*. Al decir de la mayoría,

> ... interrumpió las labores de ambos y el funcionamiento habitual de la actividad administrativa de un supervisor y otro trabajador en *detrimento de la continuidad y regularidad de los servicios que prestaba la agencia.*
>
> *En forma directa infligió daño físico a Nuño Gorbea*, quien tuvo que ser atendido por un médico. *Sometió a dicho empleado a la humillación y al menosprecio de sus compañeros en abierto menoscabo de su dignidad humana.*
>
> Su conducta no sólo afect[ó] a su compañero *sino también a la agencia.* La agresión perpetrada por Torres Solano, *de por sí, afect[ó] el ambiente de tranquilidad, paz, seguridad y armonía en el cual deben laborar los demás empleados* y el cual la Telefónica *debe asegurar a los mismos. En su lugar, creó un ambiente de aprehensión en las relaciones interpersonales del grupo, desmoralizó el trabajo en equipo y anuló la motivación y el espíritu de servicio.*
>
> La situación se *agrava*, ya que al momento de ocurrir la agresión no estuvo provocada por el agredido y *se produce frente a un supervisor, en horas laborables y en el lugar de trabajo.* (Énfasis suplido y en el original, y escolio omitido.) *Torres Solano v. P.R.T.C.*, supra, págs. 516–517.

Ante esta conducta violenta y resquebrajamiento de la "tranquilidad, paz, seguridad y armonía", ¿qué hizo el ingeniero Negrón, en su capacidad representativa de la Telefónica? La prueba *no contradicha* refleja que le comunicó a

Torres Solano que *"había violado el Reglamento de Disciplina 48, que eso le podía significar hasta [la] pérdida de [su] empleo."* T.E., pág. 104. Cabe advertir que la Regla 48, Sec. 10.4(17) del Reglamento de Personal de la Telefónica versa sobre agresiones y penaliza tales actos con una supervisión *mínima* de diez (10) días y una sanción *máxima* de despido por primera ofensa. La prueba también revela que Torres Solano *conocía esas reglas de conducta y sus consecuencias.*

Ante esa notificación y apercibimiento, ¿cuál fue la actitud de Torres Solano? Aunque tuvo la oportunidad de *explicar su versión de los hechos, optó por permanecer en silencio. Sólo le manifestó que se sentía enfermo y se iba a reportar al Fondo del Seguro del Estado.*

Ese mismo día, el ingeniero Negrón, a tono con el apercibimiento, seriedad de la conducta y, obviamente, insatisfecho con la explicación de Torres Solano sobre "enfermedad súbita", le cursó una carta donde le informaba su suspensión indefinida de empleo y sueldo por violar la referida Regla 48. Como razón le indicó el incidente de agresión antes relatado. Cabe señalar que, por existir unos trámites internos reglamentarios, la suspensión fue de *naturaleza interlocutoria.* El 22 de junio de 1984 el ingeniero Negrón le comunicó haber variado esa suspensión a un despido, retroactivo al día del incidente. Torres Solano fue apercibido de su derecho a cuestionar ese dictamen en el segundo nivel de supervisión y, después, ante el director de relaciones de empleados.

Así lo hizo Torres Solano. Luego, pidió la revisión al Presidente de la Telefónica y éste nombró un Oficial Examinador. El *17 de septiembre y 5 de octubre de 1984* dicho examinador celebró las vistas administrativas evidenciarias. Encontró probados los hechos y justificado el despido. Sin embargo, ordenó a la Telefónica que le pagara el salario desde la agresión y suspensión hasta su decisión

el 15 de abril de 1985 a base de *Cleveland Board of Education v. Loudermill*, supra.

## IV

*Pronunciamientos doctrinales*

En *Vélez Ramírez v. Romero Barceló*, supra, pág. 730 —con referencia a la suspensión de empleo y sueldo de un alcalde *bajo* la Ley Municipal, 21 L.P.R.A. sec. 1101 *et seq.*— expresamos:

> Hemos resuelto que *el debido proceso de ley no requiere que haya una vista previa a toda privación de un derecho o interés propietario.* Cuando hay una privación temporal basta que en algún momento significativo u oportuno el afectado tenga la oportunidad de defenderse y presentar su caso en un proceso con adecuadas garantías. *Se reconoce que hay ocasiones en que el Estado tiene algún interés de importancia que exige la intervención temporal con la propiedad o libertad de una persona antes de que pueda brindársele la oportunidad de ser oído.* La doctrina informa que para determinar si el tipo de vista concedida y el momento en que se brinda son constitucionalmente aceptables, *hay que analizar conjuntamente los intereses gubernamentales y los de la persona afectada. Rodríguez v. Tribunal Superior,* 104 D.P.R. 335 (1975); *Domínguez Talavera v. Tribunal Superior,* 102 D.P.R. 423 (1974); *Mathews v. Eldridge,* 424 U.S. 319 (1976); *Arnett v. Kennedy,* 416 U.S. 134 (1974); Davis, *Administrative Law Treatise,* 2da ed., San Diego, K.C. Davis Pub. Co., 1979, Vol. 2, Secs. 11:12 y 12:14, págs. 388–395 y 462–463.

*Allí* enumeramos los factores a considerarse al determinar cuándo el debido proceso de ley no permite suspender o destituir a un empleado público permanentemente de su puesto sin concederle una vista previa. Estos serían: (1) los intereses afectados por la acción oficial; (2) el riesgo de una determinación errónea que prive a la persona del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o distintas, y (3) el interés gubernamental protegido con la acción sumaria, incluso la fun-

ción de que se trata y las cargas fiscales y administrativas que conllevaría el imponer otras garantías procesales. *Vélez Ramírez v. Romero Barceló*, supra, págs. 730–736.

Ese estado de derecho prevaleció en nuestra jurisdicción *hasta* el 19 de marzo de 1985 cuando el Tribunal Supremo federal determinó en *Cleveland Board of Education v. Loudermill*, supra, que una vez el Estado crea un interés o derecho propietario, como el derecho al empleo, el debido proceso de ley a aplicarse en protección de ese interés es exclusivamente materia constitucional federal. Resolvió que antes de separar a un empleado público de su empleo *había* que concederle *algún tipo de vista* (*some kind of hearing*), en la cual éste *tuviera la oportunidad de ofrecer su versión de los hechos que motivaron la actuación del patrono.*

En síntesis, *Cleveland Board of Education v. Loudermill*, supra, exige que antes del despido del empleado la autoridad nominadora debe notificarle los cargos en su contra y la intención de despedirlo, y concederle la oportunidad de una vista informal para que presente su versión de los hechos (*an opportunity to present his side of the story*). *De ninguna manera tiene que ser una vista formal y elaborada.* La formalidad y los requisitos procesales de la vista *dependerán* de la importancia de los intereses en juego y de la naturaleza de los procedimientos ulteriores. No tiene que ser una vista evidenciaria completa (*full evidenciary hearing*), sino *algo menor* (*something less*). Tampoco tiene que resolver definitivamente la propiedad del despido, *sino más bien servir como un cotejo inicial que evita la toma de decisiones erróneas o determinación de base razonable de veracidad de los cargos que sostendrán el despido.* Después de esa vista informal podrá decretarse el despido, sujeto siempre a la celebración de una vista formal posterior que cumpla con todos los requisitos del debido proceso de ley.

El carácter informal de la vista previa al despido persi-

gue establecer un justo balance entre el interés del empleado en la retención de su puesto y el interés del Estado en que el despido se efectúe rápidamente cuando sea meritorio. Véanse: L.B. Howard, *Cleveland Board of Education v. Loudermill: Procedural Due Process Protection for Public Employees*, 47 Ohio St. L.J. 1115 (1986); K.M. Murchison, *Local Government Law*, 48 La. L. Rev. 303 (1987).

## V

*Rutas decisorias*

Bajo cualesquiera doctrinas —*Vélez Ramírez v. Romero Barceló*, supra, o *Cleveland Board of Education v. Loudermill*, supra— la conducta agresiva desplegada por Torres Solano, que no era la primera, *justificó por excepción* su suspensión interlocutoria e inmediata de empleo y sueldo. La propia opinión mayoritaria así reconoció *la naturaleza grave de la ofensa y la situación de emergencia* creada:

> ... [L]a medida disciplinaria debe guardar proporción con la ofensa cometida.
>
> El Reglamento de Personal de la Telefónica determinó que la agresión de un empleado hacia *otro* es justa causa para el despido *aun* cuando fuera la primera ofensa del agresor. Esa regla de la Telefónica *nos parece razonable*. La aplicación de la acción disciplinaria es, a su vez, *proporcional a la ofensa que intenta corregir*, aun cuando *se trate de una primera ofensa*.
>
> *El efecto directo de una agresión a un compañero de trabajo es el daño físico, la humillación y el menosprecio de la dignidad humana del agredido. Además, puede causar daños directos a la propiedad de la agencia, así como distraer la atención de los demás compañeros de labores. En la cadena de eventos directos detiene así la continuidad y regularidad en la prestación de servicios en menoscabo de la eficiencia y productividad de la agencia.*
>
> En resumen, por ir en contra de los objetivos y criterios que deben imperar en el empleo público, la agresión a un compañero de trabajo durante horas laborables y en los predios de la agencia *es causa justificada para el despido, aun cuando sea la primera falta del empleado.*

A la luz de los parámetros que rigen el empleo público, *concluimos que la agresión perpetrada por Torres Solano justificaba su despido como penalidad por una primera ofensa.* (Énfasis suplido y en el original, y escolio omitido.) *Torres Solano v. P.R.T.C.*, supra, págs. 515–516.

En estas circunstancias, no nos explicamos el porqué de las afirmaciones más importantes expuestas en la opinión original. Las mismas no compaginan con la conclusión de que a Torres Solano se le violó el debido proceso de ley. ¿Cómo pudo sostenerse que la Telefónica "pudo haber limitado su sanción interlocutoria a una suspensión de empleo con sueldo al escuchar la versión de lo ocurrido de Torres Solano"? *Torres Solano v. P.R.T.C.*, supra, pág. 529. Nótese que ante el examinador, Torres Solano *negó* la agresión; sin embargo, esa postura no le mereció crédito al juzgador. Ante la prueba demostrativa de esa agresión, no tuvo otra alternativa que aceptarla ante el foro de instancia (Hon. Ángel G. Hermida, Juez).

Frente a esta falta de credibilidad y vaivenes procesales, no entendemos cómo pudo afirmarse que Torres Solano "presentó evidencia de provocación por parte de Nuño Gorbea", justificativa de su agresión. *Torres Solano v. P.R.T.C.*, supra, pág. 529. Este aserto confundió dos de los factores presentes en todo proceso adjudicativo: la prueba "presentada" y su valor probatorio. ¿Es que ahora, en derecho probatorio, "presentar" es sinónimo de "demostrar"? Repetimos, Torres Solano negó la verdad del suceso.

Tampoco comprendemos cómo pudieron argumentar que era su *primera ofensa*, cuando el récord refleja *un historial en contrario*. Finalmente, ante estas realidades, ¿cómo pudieron decir que la probabilidad de que la agencia tomara una determinación errónea era "alta"? *Torres Solano v. P.R.T.C.*, supra, pág. 529.

En resumen, los hechos expuestos demuestran una situación de agresión violenta por parte de Torres Solano que afectó seriamente el ambiente del trabajo y justificó,

como medida cautelar y de emergencia, su suspensión inmediata. La agresión per se configuró una situación de excepción a las normas pautadas en *Vélez Ramírez v. Romero Barceló,* supra, y en *Cleveland Board of Education v. Loudermill,* supra.

Para la suspensión interlocutoria no era necesario otro tipo de vista. Torres Solano fue informado por su supervisor de la gravedad de su conducta y posible suspensión como sanción disciplinaria según el reglamento. Así informado, escogió simplemente decir que estaba enfermo y marcharse. Después de esta vista, tuvo amplia oportunidad de cuestionar y defenderse en una vista llena de formalidades. Con sinceridad, ¿puede genuinamente quejarse?

Por los fundamentos expuestos, reconsideraríamos.